**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DR. JENNY H. CONVISER and ASCEND CONSULATION IN HEALH CARE, LLC, | |
| Plaintiffs, | No. 20-cv-03094 |
| v. | Judge Franklin U. Valderrama |
| DEPAUL UNIVERSITY, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Dr. Jenny H. Conviser (Dr. Conviser) and Ascend Consultation in Health Care, LLC (Ascend) (collectively, Plaintiffs) have filed suit against Defendant DePaul University (DePaul), asserting wrongful retaliation under Title IX, 20 U.S.C. § 1681, *et seq.* and several related state law claims. Plaintiffs' claims stem from allegations that DePaul retaliated against them following their involvement in the reporting of a head softball coach's abuse of players and coaching staff. DePaul now moves to dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), primarily on the ground that Plaintiffs, as independent contractors, cannot assert statutory standing under Title IX. R. 23, Mot. Dismiss. For the reasons set forth below, DePaul's Motion to Dismiss is granted. In what appears to be a case of first impression, the Court finds that Plaintiffs do not have Title IX statutory standing, because they are neither employees of an educational program or activity nor deprived of access to an educational program or activity. Lacking

statutory standing, the Court dismisses Count I. The Court declines to exercise supplemental jurisdiction over Counts II and III, Plaintiffs' remaining state law claims, and dismisses the same.

## Background

From 2005 to 2018, licensed clinical psychologist Dr. Conviser provided sports psychology and mental health services to members of the DePaul community. R. 19, First Amended Complaint (FAC) ¶¶ 5, 16–17, 22.[1][2] Dr. Conviser and her staff specifically treated members of DePaul's sports community, including coaches, managers, and student-athletes, to ensure that their mental health and nutritional needs were met. *Id*. ¶¶ 50–52. The FAC characterizes Dr. Conviser and her companies (e.g., Plaintiff Ascend, founded in 2013) as DePaul's "outsourced, sole sourced, mental health provider[s]" during this time. *Id*. ¶¶ 21, 99.

Dr. Conviser claims that in her health provider position and at DePaul's direction, she played "an integral and active role" in DePaul's Title IX program. FAC ¶ 56. DePaul instructed Dr. Conviser to (a) report abusive conduct to DePaul's Title IX Office; (b) participate in any investigations conducted by DePaul's Title IX Office that resulted from her reports; and (c) meet with, train, and/or counsel DePaul coaches and staff on proper Title IX conduct. *Id*. In that vein, Dr. Conviser asserts that she learned of several allegations of abuse primarily perpetrated by then-head

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

[2]The Court accepts as true all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of Plaintiffs. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

women's softball coach Eugene Lenti (Coach Lenti), and in each instance, either reported the conduct herself or encouraged the reporting of the conduct to the DePaul administration. *Id.* ¶ 1. Each reporting incident is further detailed below.

The first reporting incident occurred in the fall of 2016. Dr. Conviser "obtained credible and actionable information from her patients and others" that Coach Lenti was "'out of control,' frequently abusive and aggressive to his staff and players, and fostered a culture of intimidation, fear and retaliation." FAC ¶ 57. Upon hearing this information, Dr. Conviser immediately reported the allegations to DePaul's Director of Sports Medicine and the Assistant Athletics Director. *Id.* ¶ 58. Dr. Conviser claims that no investigation was initiated, and they instead instructed her to meet with Coach Lenti and his staff to address the issues raised and to review their Title IX responsibilities, a task which she carried out over a series of coaching sessions. *Id.* ¶¶ 58–60. Plaintiffs claim that DePaul slowly stopped referring patients to Dr. Conviser and Ascend after she first reported Coach Lenti's misconduct in 2016, DePaul's first alleged act of retaliation. *Id.* ¶ 101.

The following year, in June 2017, DePaul entered into a new four-year Professional Services Agreement (PSA) with Ascend that allowed DePaul to refer student-athletes to Ascend for mental health services. FAC ¶ 67. The PSA reads, in relevant part:

> WHEREAS, DePaul requires the services of professionals specializing in the evaluation and treatment of mental illnesses, issues of a psychological nature, and nutritional therapy for student-athletes at DePaul;

WHEREAS, DePaul desires to continue to refer certain student-athletes to obtain clinical psychological and/or counseling services on a non-exclusive basis from the professionals of Ascend;

WHEREAS, AscendCHC is willing to provide clinical psychology assessment and psychotherapy and nutrition assessment, education and support for student-athletes at DePaul University who have been pre-approved by the University for such services;

\*\*\*

## 1.    TERM

The term of the Agreement will be for four (4) years beginning July 1, 2017 ("the Effective Date") and ending June 30, 2021 (the "Termination Date").

## 2.    REFERRAL

(a) DePaul may refer student-athletes that it believes are in need of clinical psychological assessment to Ascend. Ascend will provide a preliminary assessment for such student-athlete and make a recommendation as to the form of further treatment.

(b) Ascend agrees to conduct a preliminary evaluation of illnesses of a psychological or nutritional nature of the student-athletes referred to it by DePaul on a non-exclusive basis.

\*\*\*

## 11.    INDEPENDENT CONTRACTOR

(a) Ascend is an independent contractor of DePaul, and neither AscendCHC nor any of its employees or contracted health service providers are employees, agents, joint venturers or partners of DePaul.

(b) AscendCHC agrees not to market or hold itself out publicly as an employee of DePaul or as the exclusive or official sports psychologist of DePaul Athletics.

\*\*\*

## 14.    TERMINATION

(a) This Agreement shall only be terminated prior to the Termination Date with prior written notice as fully set forth below or as otherwise provided in Section 14:

***

(b) This Agreement may be terminated with prior written notice as fully set forth below:

(i) By either party, upon the material breach of any term of this Agreement, provided thirty (30) days prior written notice is delivered to the breaching party <u>and</u> the cause giving rise to the claimed breach has not been cured within the thirty (30) day notice period.

R. 24-1, Mot. Dismiss Memo. Exh. A, PSA at 1, 4–5, 7 (emphasis in original).[3]

In December 2017, at Dr. Conviser's request, Dr. Conviser met with Athletics Department administrators to discuss student mental health services and resources at DePaul. FAC ¶ 71. During this meeting, Dr. Conviser raised concerns about Coach Lenti and highlighted examples of abusive behavior that had been reported to her, including student-athletes being "ignored, excluded, teased, yelled at, addressed with profanity, criticized and/or called derogatory names." *Id.* ¶ 72.

In February 2018, Dr. Conviser and her staff counseled a student-athlete patient to report a campus-related sexual assault (unrelated to Coach Lenti and the women's softball team) to DePaul's Title IX Office. FAC ¶ 77. The student reported the assault to the Title IX Office, and Dr. Conviser also subsequently informed the Director of Sports Medicine about the assault. *Id.* Dr. Conviser alleges that after the student reported, DePaul's Title IX Coordinator immediately contacted her and

---

[3]The Court may consider the PSA at the pleadings stage because Plaintiffs' First Amended Complaint incorporates the PSA and the PSA is central to Plaintiffs' claims. *Allstate Life Ins. Co. v. Peoplesoft, Inc.*, 2004 WL 1375383, at *2 (N.D. Ill. May 26, 2004) (collecting cases).

inexplicably accused her of deterring students from reporting improper conduct under DePaul's Title IX program. *Id*. ¶ 78.

Finally, in April 2018, Dr. Conviser learned that a student-athlete patient had informed an Ascend therapist of an incident involving Coach Lenti punching a female associate head coach in the face. FAC ¶ 85. Dr. Conviser directed the therapist to counsel the student to report the incident. *Id*. ¶ 86. The therapist counseled the student as instructed, and the student reported the incident to DePaul's Title IX Office on April 6, 2018. *Id*. ¶ 87.

One week after the student reported the punching incident, Plaintiffs allege that DePaul "terminat[ed]" its agreement with Ascend "three years early." FAC ¶ 97. Specifically, DePaul "went so far as to 'rescind care' in the middle of treatment for a DePaul student-athlete and direct Dr. Conviser to refer the student back to the University for treatment." *Id*. ¶ 98. DePaul ceased referring student-athletes to Dr. Conviser and Ascend altogether, citing a "sudden" preference to utilize its internal counseling services rather than Ascend's. *Id*. ¶ 99. At some point, DePaul also told student-athletes that DePaul would no longer pay for services provided by Dr. Conviser and Ascend. *Id*. ¶ 127.

On or about April 19, 2018, DePaul's Title IX Office initiated an investigation into Coach Lenti's conduct; Coach Lenti retired that summer. FAC ¶¶ 90, 92. Plaintiffs allege, upon information and belief, that DePaul's Title IX Office and Athletics Department learned about Dr. Conviser's involvement during this investigation. *Id*. ¶ 89.

On April 15, 2020, Plaintiffs filed suit against DePaul in the Circuit Court of Cook County, asserting a Title IX retaliation claim and several state law claims, including breach of contract and defamation. R. 1-1. DePaul removed the case to federal court, and Plaintiffs subsequently filed the First Amended Complaint, at issue here. FAC at 1 n.1. Plaintiffs' First Amended Complaint initially contained six counts: retaliation in violation of Title IX (Count I); breach of contract and the implied covenant of good faith and fair dealing (Count II); indemnification (Count III); defamation *per se* (Count IV); defamation *per quod* (Count V); and false light (Count VI). DePaul moves to dismiss Plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6). *See* Mot. Dismiss. In their response to DePaul's motion, Plaintiffs agreed to voluntarily withdraw their claims for defamation *per se* (Count IV), defamation *per quod* (Count V), and false light (Count VI). *See* R. 28, Resp. at 4 n.1. Accordingly, the Court will consider DePaul's motion with respect to Counts I through III only.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

Importantly here, questions of statutory standing are also reviewed under Rule 12(b)(6), and the Court's inquiry into statutory standing at the motion to dismiss stage is limited to the pleadings. *In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 951 (N.D. Ill. 2016).

## Discussion

## I.    Count I: Title IX Retaliation

Plaintiffs allege that DePaul, in retaliation for Plaintiffs' involvement in the reporting of Coach Lenti's alleged Title IX violations, terminated the PSA early. FAC ¶ 112. DePaul contends that Plaintiffs' Title IX retaliation claim should be dismissed, because (i) Plaintiffs lack statutory standing to bring a Title IX retaliation claim, and (ii) Plaintiffs have not otherwise plausibly alleged the elements of a Title IX retaliation claim. R. 24, Mot. Dismiss Memo. at 4–8. The Court addresses each argument in turn.

### A.    Statutory Standing

DePaul argues that Plaintiffs, independent contractors who have merely "crossed commercial paths" with DePaul, do not have statutory standing to bring a

Title IX claim against the university. Mot. Dismiss Memo. at 6. Plaintiffs disagree, asserting that the "zone of interests" test is satisfied, and they have standing to bring their Title IX claims. Resp. at 4. Before examining the merits of the parties' positions on statutory standing, it is instructive to briefly review the evolution of the Title IX statute and the Title IX retaliation claim in the context of relevant case law.

### i. Title IX Retaliation, Generally

The Court begins, as it must, with the text of the statute. Title IX provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). While the language of Title IX does not expressly provide a private right of action, the Supreme Court, through a series of cases, has interpreted Title IX to provide a private right of action for students complaining of teacher and peer sexual harassment and for employees complaining of sexual harassment or discrimination in the education workplace. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (finding a plaintiff could sue for student-on-student sexual harassment); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998) (recognizing a claim of deliberate indifference for a teacher's sexual harassment of a student); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520–21 (1982) (finding that an individual employed by a federally funded educational institution could bring a claim under Title IX).

In 2005, the Supreme Court extended Title IX's reach to include a cause of action for "retaliation." *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74, 184 (2005). In *Jackson*, the Court considered a retaliation claim brought by a high school basketball coach and physical education teacher, who was removed from his coaching position after reporting sex discrimination in the school's athletic program. *Jackson*, 544 U.S. at 171–72. In determining the plaintiff could bring a claim against the school board, the Court noted, "[r]etaliation . . . is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.* at 173–74 (citations omitted). The Court also explained "[Title IX] is broadly worded; it does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint." *Id.* at 179. Rather, in part because "[r]eporting incidents of discrimination is integral to Title IX enforcement," *id.* at 180, "[w]here the retaliation occurs because the complainant speaks out about sex discrimination, the 'on the basis of sex' requirement is satisfied," *id.* at 179. This precisely encapsulates the type of claim Plaintiffs bring here. Dr. Conviser claims that although she was not the object of sexual discrimination, she participated in the reporting of improper conduct, and in retaliation for doing so, DePaul terminated its contract with her company, Ascend.

### ii.  Plaintiffs' Statutory Standing Under Title IX

However, to bring a retaliation cause of action under Title IX, as with any statutory claim, Plaintiffs must have statutory standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). In determining whether Plaintiffs have standing, the Court must consider whether they "fall within the class of plaintiffs whom Congress has authorized to sue." *Lexmark*, 572 U.S. at 128. In other words, Plaintiffs—independent contractors that provide mental health care services for referred DePaul students[4]—must "fall within the zone of interests protected by the law invoked." *Id*. at 126 (internal citations omitted). A "zone of interests" analysis begins with the statute at issue. *Id*. at 130. Courts assess Congress' authorization using "traditional principles of statutory interpretation[,]" asking not "whether in our judgment Congress *should* have authorized [the] suit, but whether Congress in fact did so." *Id*. at 128, 138 (emphasis in original).

Looking at the statute again, Title IX states that "*[n]o person* in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under any education program or activity* receiving Federal financial assistance," subject to certain exceptions.[5] 20 U.S.C.

---

[4]The PSA defines Ascend as an independent contractor. *See* PSA at 4 ("Ascend is an independent contractor of DePaul, and neither AscendCHC nor any of its employees or contracted health service providers are employees, agents, joint venturers or partners of DePaul. . . . AscendCHC agrees not to market or hold itself out publicly as an employee of DePaul or as the exclusive or official sports psychologist of DePaul Athletics.").

[5]The statutory exceptions include educational institutions controlled by a religious organization, social fraternities and sororities, military services or the merchant marine, institutions that traditionally and continually admit only students of one sex, boy or girl

§ 1681(a) (emphasis added). DePaul rightly notes that the express language of the statute, "no person" (or disposing of the negative, "any person") is not especially helpful in designating proper Title IX plaintiffs. Mot. Dismiss Memo. at 4.

DePaul instead looks to case law, asserting that the cases applying Title IX confirm that the statute does not extend to non-students, non-employees like Plaintiffs. Mot. Dismiss Memo. at 4. In other words, DePaul argues that courts have interpreted Title IX to protect two—and only two—classes of plaintiffs: (i) employees of an education program, and (ii) students of an education program (and by extension, parents on behalf of their student-children). *Id*. at 4–7. DePaul cites to several cases— importantly, none with an analogous fact pattern and only one in the Seventh Circuit—in support of this contention. A review of DePaul's cited cases (in no particular order) and Plaintiffs' responding interpretation of those cases follows.

First, DePaul cites *Jackson*, the landmark Supreme Court case already discussed above that established the retaliation cause of action. *Jackson*, 544 U.S. at 171–72. DePaul submits that when discussing the scope of Title IX's retaliation protections, the Court focused exclusively on conduct targeting either employees or students; that is, as DePaul explains, individuals who would be subjected to retaliation through an "education program or activity," the only meaningfully qualifying language in the Title IX statute. Mot. Dismiss Memo. at 4–5 (citing *Jackson*, 544 U.S. at 179 n.3, 180). In their Response, Plaintiffs insist that *Jackson* stands for an entirely different proposition. Resp. at 6. Plaintiffs explain that the

---

conferences, father-son and mother-daughter activities, and beauty pageants. 20 U.S.C. § 1681(a)(1)–(9).

Court held Title IX "broadly prohibits" a funding recipient from subjecting any person to discrimination on the basis of sex. *Id.* Plaintiffs surmise that Congress could have substituted "student" or "beneficiary" for "person," if it had wished to restrict the scope of Section 1681. *Id.* at 5 (citing *N. Haven*, 456 U.S. at 520). But Plaintiffs note that Congress did not, leaving the category of plaintiffs who can seek the protection of Title IX intentionally broad. *Id.* Moreover, Plaintiffs point to the Court's statement that, "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also to provide *individual citizens* effective protection against those practices. . . . [T]his objective would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation." *Jackson*, 544 U.S. at 180 (emphasis added). Essentially, Plaintiffs maintain that because the language of Title IX is "broad," it should be interpreted broadly, and the Supreme Court has found that Title IX is meant to generally protect "individual citizens," against government-funded retaliatory discrimination. Resp. at 5–8.

Second, DePaul relies on *Doe v. Brown Univ.* for the proposition that the phrase, "education program or activity," limits Title IX's scope to those who seek or receive "educational benefits" from the defendant. Mot. Dismiss Memo. at 4 (citing 270 F. Supp. 3d 560, 560–61 (D.R.I. 2017), *aff'd*, 896 F.3d 127 (1st Cir. 2018)). In *Brown Univ.*, similarly a case of first impression at the time, a Providence College student was sexually assaulted by several Brown University students on Brown's campus. *Brown Univ.*, 270 F. Supp. 3d at 558. Following the assault, the plaintiff

13

withdrew from Providence College, alleging that she was forced to do so because Brown University refused to discipline her attackers, allowing them free range of Providence College and causing her to fear for her safety on the Providence College campus. *Id.* at 558–59. The court found that the plaintiff, as a Providence College student, did not have Title IX standing to sue Brown University for failure to protect and deliberate indifference, because as a non-Brown University student, she failed to allege she was denied equal access to Brown's educational benefits. *Id.* at 562–63.[6] Plaintiffs distinguish *Brown Univ.*, insisting that the plaintiff clearly fell outside of the zone of interests because the nexus between the plaintiff and the defendant's actions was prohibitively attenuated. Resp. at 7. Notably, the *Brown Univ.* plaintiff made a broad application argument similar to Plaintiffs here, asserting that by use of the general term, "person" (as opposed to "student"), Congress intended to protect all persons coming within the school's control, including guests on campus. *Brown Univ.*, 270 F. Supp. 3d at 560. The court rejected that argument, putting at least some restriction on "person," again focusing on the fact that the plaintiff, guest or no guest, was not deprived of Brown's educational benefits.

Third, DePaul points to *Prey v. Kruse*, in which the plaintiff brought suit against a West Liberty State College university professor, making a fairly novel Title IX argument that the defendant professor used his position of power to seduce the

---

[6]The First Circuit affirmed, agreeing with the district court that the plaintiff's complaint contained no allegations as to how the defendant's deliberate indifference deprived her of access to the educational opportunities and benefits provided by Brown, and therefore did not state a plausible claim under Title IX. *Doe v. Brown Univ.*, 896 F.3d 127, 133 (1st Cir. 2018).

plaintiff's girlfriend. Mot. Dismiss Memo. at 5 (citing 2009 WL 10679036, at *2 (S.D. Ohio June 9, 2009)). The court noted that the plaintiff's Title IX assertions were misplaced. *Prey*, 2009 WL 10679036, at *2. The court found first that Title IX does not provide for suits against individual defendants, and second that the plaintiff could not maintain a Title IX action against the college because he was not a student or an employee of the college. *Id*. Though Plaintiffs again distinguish *Prey* on factual grounds, insisting that the nexus between the *Prey* plaintiff and the college was far too removed, it is clear from DePaul's string cite that DePaul cited *Prey* more for its interpretation of *Jackson* than for an analogous fact pattern—"[t]he *Jackson* case does not confer standing beyond *potential beneficiaries or employees* of a federally funded education program." *Id*. (citing *Jackson*, 544 U.S. 167) (emphasis added).

Fourth, DePaul cites *Lopez v. San Luis Valley, Bd. of Co-Op Educ. Servs.*, where the plaintiff (a principal of an elementary school) brought a Title IX suit against an educational services program, alleging that the program's employee harassed her during a meeting. Mot. Dismiss Memo. at 5 (citing 977 F. Supp. 1422, 1424 (D. Colo. 1997)). The court dismissed the Title IX claim for lack of statutory standing because the plaintiff was not an employee, potential participant, or beneficiary of the defendant's educational services program. *Id*. at 1426. Plaintiffs again distinguish this case on factual grounds, insisting that the nexus between the plaintiff and the defendant program was too far removed. Resp. 7–8.

Fifth, DePaul relies on *Brown v. Ill. Dep't of Human Servs.*, the only Seventh Circuit case DePaul cites in connection with standing, in which the court held that a

visually-impaired vending facilities contractor of the Illinois Department of Human Services did not have statutory standing to assert a claim under Title IX, because she was not an "employee of the Department." Mot. Dismiss Memo. at 5 (citing 717 F. App'x 623, 626 (7th Cir. 2018)). Plaintiffs argue *Brown* is distinguishable, because although the plaintiff was similarly an independent contractor, the *Brown* plaintiff brought an *employment* discrimination suit (not a retaliation suit), with *employment* being necessary for asserting standing. Resp. at 7.

Sixth and finally, DePaul cites *Rossley v. Drake Univ.*, in which the court held that the plaintiff—a former Drake University Board of Trustees (the Board) member and the parent of a Drake University student—lacked statutory standing to bring a retaliation claim based on Drake University's refusal to allow him to participate in the Title IX investigation of his son and the Board's vote to remove him from his position as a Board member. Mot. Dismiss Memo. at 5 (citing 336 F. Supp. 3d 959, 970 (S.D. Iowa 2018)), *aff'd*, 958 F.3d 679 (8th Cir. 2020). In reviewing the language of the Title IX statute and the regulations promulgated under Title IX, and in comparing analogous case law interpreting the statute, the court found that Title IX's prohibition on discrimination applies to those programs which relate to either (i) educational opportunities for students or (ii) employment benefits and programs intended for faculty and staff. *Rossley*, 336 F. Supp. 3d at 971–74.

Using that lens, the court first determined that Rossley was not an "employee" of either Drake University or the Board. *Rossley*, 336 F. Supp. 3d at 972. In a previous order in the same case, the court had examined whether Rossley was an "employee"

16

under the Americans with Disabilities Act (ADA), which uses the same framework as Title IX for determining employment status. *Id*. at 972 n.5. Under that test, the court determined that Rossley, a Board member, was not an "employee" and consequently had failed to plausibly state a claim that he was subjected to discrimination under any employment benefits or programs under Title IX. *Id*. at 972.

That determination left one more standing option for Rossley—he had to plausibly assert that Drake University denied him access to any education programs or activities as a non-employee. *Rossley*, 336 F. Supp. 3d at 972. The court found he had not done so. The court reviewed the hallmarks of a federally funded education program, finding that the Board neither provided any educational benefits—it did not permit Board participants to earn a degree, accept tuition, offer accreditation, or provide a course of study—nor received federal funds. *Id*. 972–73. Importantly, even if the Board *did* provide education programs or activities, the court found that Rossley, as a trustee, had failed to plausibly allege *he* was denied access to or participation in those programs or activities. *Id*. at 973. In sum, and answering the ultimate question, the court found that Rossley had failed to state a claim showing he was "excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination under any education program or activity" offered by the defendant, and as such, he lacked statutory standing to bring a retaliation claim under Title IX. *Id*.[7]

---

[7]The Eighth Circuit affirmed, rejecting Rossley's argument that "any advocate has standing to bring a retaliation claim under Title IX, and to establish such a claim a plaintiff need only show that he was retaliated against *because* he complained of sex discrimination." *Rossley v.*

17

Taking these cases together, DePaul maintains that courts have limited Title IX statutory standing to (i) employees of education programs or (ii) students (those who seek or receive educational benefits) of education programs, and Plaintiffs are neither employees nor students. Mot. Dismiss Memo. at 6 ("As independent contractors, Conviser and Ascend fall squarely outside this well-established 'zone of interest.' Neither Conviser nor Ascend were DePaul students, nor were they DePaul employees."). Plaintiffs, in response, factually distinguish all of DePaul's cited cases and insist that the broad language of Title IX should be read broadly in turn to further the purposes of Title IX. Resp. 5, 7–8 ("On its face, the Statute, unlike Title VII, is very broad as to whom it protects, and does not expressly limit who can sue. . . . [It] *cannot be the law* [that] an institution of higher learning could simply remove itself from the ambit of Title IX by electing to outsource and 'privatize' its faculty classrooms, dormitories, libraries, sports facilities, and in this case, its mental health services.") (emphasis in original).

The Court agrees with Plaintiffs that none of DePaul's cited cases present the same factual situation. This is indisputable. In reviewing the cases cited by both parties (and in engaging in its own research), the Court notes that the instant case appears to be the first to deal with Title IX statutory standing of independent contractors. Still, after factually distinguishing DePaul's cases, Plaintiffs only proffer one case of their own—*Fox v. Pittsburgh State Univ.*, 257 F. Supp. 3d 1112, 1124 (D.

---

*Drake Univ.*, 958 F.3d 679, 685 (8th Cir. 2020). It held that "neither the statutory text nor the precedent supports such an expansion" and affirmed the district court's dismissal of Rossley's Title IX retaliation claim for lack of statutory standing. *Id.*

Kan. 2017). Plaintiffs assert that *Fox*, which rejects the argument that an employee must show a "'nexus' to education to qualify for Title IX remedies," dispels DePaul's insistence on a so-called "educational benefits" requirement. Resp. at 6 (citing *Fox*, 257 F. Supp. 3d at 1124). Indeed, Plaintiffs maintain that a university employee working in the student housing office, in the cafeteria, or on the campus shuttle bus service is not afforded "educational benefits" but is nonetheless protected under Title IX (and rightly so). Resp. at 6. But Plaintiffs are mistaken in their application of *Fox*. DePaul is not suggesting that a Title IX plaintiff must be deprived of educational benefits to state a claim; rather, DePaul contends that case law has been extended to two classes of plaintiffs—employees (who may work for the university in an educational context or in a non-educational context) and non-employees (students, who must be deprived of some educational benefit). Because Fox was a Pittsburgh State University employee, there was no need for an educational nexus; had Fox *not* been an employee, the case is clear that she would have to show there was a "systemic effect of denying [her] equal access to an educational program or activity." *Fox*, 257 F. Supp. 3d at 1126 (internal citation omitted).

Though it's true that the factual circumstances of the cited cases are not exactly on point, the Court agrees with DePaul that the underlying reasoning of these cases is instructive, and in the end, dispositive.

The Court finds that *Rossley*, with the board of trustee-plaintiff, is closest in terms of facts and is compelling in terms of reasoning. *Rossley* makes clear that *Jackson* and the plain language of Title IX extend statutory standing to (i) employees

of an education program or activity (the *Jackson* employee basketball coach) and (ii) those who are denied access to an "education program or activity." 336 F. Supp. at 970, 973. Plaintiffs do not claim that they are employees under Title IX.[8] *See* Resp. at 5 (acknowledging that "it is true that Plaintiffs are not . . . employees"). Moreover, the PSA clearly states that Plaintiffs are independent contractors. *See* PSA at 4.

As non-employees, then, the Court must determine if Plaintiffs have been subjected to discrimination "under any education program or benefit." 20 U.S.C. § 1681(a). A crucial part of this analysis, and what Plaintiffs fail to grasp, is that a plaintiff cannot simply assert that a federally-funded educational program discriminated against him or her on the basis of sex and automatically meets the "under any education program or benefit" requirement. If that were the case, the outcome would have been different in *Doe*, *Prey*, and *Rossley*. Rather, a plaintiff must assert not only that the defendant provided educational programs or activities, but also that the *plaintiff was denied* access to or participation in those programs or activities. *See Rossley*, 336 F. Supp. 3d at 973 ("Even if the Board did provide education programs or activities to students, Rossley has not plausibly alleged he, as a Trustee, was denied access to or participation in those programs or activities."). This point is where Plaintiffs ultimately fail. Of course, DePaul provides educational programs and activities to its students. But Plaintiffs have not plausibly alleged (nor

---

[8]Plaintiffs include one line in their Response that DePaul "treat[ed] [Dr. Conviser] at all times as if she was an employee." *Id.* at 6. However, Dr. Conviser does not expand on this to argue why she should be considered an employee under Title IX and has thus waived the "employee class of plaintiffs" argument. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("[A] party waives an argument by failing to make it before the district court.").

can they) that DePaul's retaliatory actions prevented Dr. Conviser and Ascend from accessing those programs or activities. At most, DePaul's actions deprived Dr. Conviser and Ascend of an economic benefit, which is not redressed by Title IX.

The court in *Rossley* put it best—"neither *Jackson* nor the plain language of Title IX can be extended to provide statutory standing to a non-student, non-employee who reported alleged sex discrimination against his adult son." *Rossley*, 336 F. Supp. 3d at 966. Here too, neither *Jackson* nor the plain language of Title IX can be extended to provide statutory standing to non-students, non-employees who reported alleged sex discrimination against their patients.

Under this analysis, the Court finds that Plaintiffs cannot assert Title IX statutory standing, and as such, Count I must be dismissed.[9]

DePaul also argues that Plaintiffs' First Amended Complaint fails to plausibly state a Title IX retaliation claim. While not necessary in light of the above, for the sake of completeness, the Court also addresses this argument.[10]

---

[9]The Court acknowledges that today's decision, based on statutory interpretation and analysis of comparable case law, could have policy ramifications that may be attractive to some and seem harsh to others. But it is the Court's role to read the plain text of the statute and to adhere to case law, not to decline to do so on policy grounds. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders . . . .").

[10]The Court has federal question jurisdiction over Plaintiffs' Title IX retaliation claim under 28 U.S.C. § 1331. A lack of statutory standing does not deprive this Court of subject matter jurisdiction. *See Jordan v. Jewel Food Stores, Inc.*, 2015 WL 3561493, at *2 (N.D. Ill. June 5, 2015) ("*Lexmark International* makes clear that 'statutory standing' presents a merits and not a jurisdictional issue.") (*citing Lexmark*, 572 U.S. 118, 128 n.4 ("'[S]tatutory standing' . . . does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case.") (internal quotation marks omitted) (emphasis in original)).

### b. Stating a Title IX Third-Party Retaliation Claim

To establish a claim for Title IX retaliation, Plaintiffs must satisfy two tests. First, to proceed on a third-party retaliation claim (Plaintiffs are third parties to the underlying discrimination), Plaintiffs must allege a sufficient connection between them and the individuals who have been discriminated against. *Jackson*, 544 U.S. at 183. And second, as with all retaliation claims, Plaintiffs must allege the claim's three elements—that (1) they engaged in a statutorily protected activity; (2) the school took a materially adverse action against them; and (3) there existed a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing *Milligan v. Bd. of Trs.*, 686 F.3d 378, 388 (7th Cir. 2012); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 337, 360 (2013)). The Court will analyze each test in turn.

### i. Sufficient Connection

Retaliating against individuals "because they complain of sex discrimination is 'intentional conduct that violates the clear terms of the statute.'" *Jackson*, 544 U.S. at 183 (citing *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 642 (1999)). Title IX does not require that "the victim of the retaliation must also be the victim of the discrimination . . . ." *Id.* at 179. However, the victim of the discrimination and the person alleging retaliation must have a close affiliation. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174–75 (2011); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

There is no set standard governing this requisite affiliation. In *Burlington*, the Supreme Court outlined that a materially adverse action must be one which might "dissuade[] a reasonable [individual] from making or supporting a charge of discrimination." 548 U.S. at 68. In *Thompson*, the Court articulated that a close family member would "almost always" meet the affiliation threshold, since retaliation against a family member would deter an individual from lodging a discrimination complaint, while a "mere acquaintance will almost never do so . . . ." *Id.* at 175; *see also Mackall v. Colvin*, 2015 WL 412922, at *1 (D. Md. Jan 29, 2015) (declining to find third-party retaliation for coworkers).

DePaul argues that Dr. Conviser's relationships with the reporting students are not close enough to support a retaliation claim. Mot. Dismiss Memo. at 9. DePaul relies primarily on the distinction between a "mere acquaintance" and a family member as articulated in *Thompson* to show that since Dr. Conviser had no connection with the students who reported incidents, her retaliation claim is too attenuated. *Id.* DePaul adds that Dr. Conviser's relationship with the student is more attenuated than even the coworker relationship in *Mackall*. *Id.* DePaul additionally cites *Ordonio v. Cnty. of Santa Clara*, a case where a patient alleged a hospital's retaliation against his doctor passed to the patient in the form of substandard care. 2012 WL 1155597, at *6 (N.D. Cal. Apr. 5, 2012). In *Ordonio*, the court dismissed the third-party retaliation claim, noting that the relationship between a patient and doctor was "limited" and particularly focused on the fact that the patient would not serve as an "effective advocate" for the doctor, and the doctor could bring his own

23

claim. *Id.* DePaul further argues that the primary purpose of Title IX retaliation claims is to protect the individuals who witness and report these incidents, and because Dr. Conviser did not witness an incident and played a minimal role in the reporting process, she does not sufficiently allege a retaliation claim. Mot. Dismiss Memo. at 9.

Plaintiffs, on the other hand, argue that they *were* an "integral" part of the reporting process. Resp. at 12. Plaintiffs write off *Mackall*, explaining that Dr. Conviser and the complaining students were more than "mere acquaintances." *Id.* at 11. Further, Plaintiffs challenge the application of *Ordonio*, noting that its "effective advocate" language is an entirely different test. *Id.* Since Dr. Conviser "coordinated" all patients referred to Ascend, counseled Ascend employees and patients to report abuse, and had mandatory Title IX obligations, Plaintiffs contend that they satisfy the relevant *Thompson* test. *Id.* at 10.

The Court finds that DePaul has the more persuasive argument in assessing the attenuation of the relationship between Plaintiffs and the reporting students. While it is possible that an individual and his/her therapist may have a close relationship that could form a sufficient connection for a third-party retaliation claim, the Court need not definitively decide that question here, as Dr. Conviser does not allege that she actually met any of the three students that lodged complaints (and no student-patient is likely to feel a strong connection to their therapist's *company*, like Ascend). Therefore, it is unlikely that a retaliatory action against Dr. Conviser or Ascend itself would deter a student from reporting discrimination under the

*Thompson* test. Plaintiffs fail to allege a sufficient connection between them and discriminated students. As such, Count I fails to state a third-party retaliation claim on this basis alone.

### ii.    Elements of a Title IX Retaliation Claim

Like with the standing analysis, even assuming arguendo that Plaintiffs could establish a sufficient connection, Count I is still doomed because Plaintiffs have failed to adequately allege the three elements of a standard Title IX retaliation claim. As detailed above, to assert a cause of action for Title IX retaliation, Plaintiffs must plead that (1) they engaged in a statutorily protected activity; (2) the school took a materially adverse action against them; and (3) there existed a but-for causal connection between the two. *Burton*, 851 F.3d at 695.

As to the first "protected activity" element, Plaintiffs allege that they engaged in three protected activities that led to retaliation by DePaul: (1) Dr. Conviser reported Coach Lenti's misconduct in the fall of 2016 (FAC ¶ 58); (2) Dr. Conviser again reported Coach Lenti's misconduct in December 2017 (*id*. ¶ 72); and (3) at Dr. Conviser's insistence, a member of Ascend's staff counseled a student-patient to report Coach Lenti to DePaul's Title IX Office in April 2018 (*id*. ¶ 87).[11] DePaul does not challenge the proposition that Plaintiffs engaged in protected activities. Mot. Dismiss Memo. at 7. No matter, as speaking out against sex discrimination is a

---

[11]Plaintiffs also allege that in February 2018, Dr. Conviser "and her staff" directed "a student-athlete patient to report a campus-related sexual assault to the University and its Title IX Office (unrelated to Coach Lenti and the softball team)." FAC ¶ 77. However, Plaintiffs make no attempt to connect this incident to the alleged retaliation. As such, the Court does not consider it here.

recognized protected activity under Title IX. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867–68 (9th Cir. 2014).

As to the second "adverse action" element, Plaintiffs assert that DePaul slowed referrals following her involvement in the 2016 complaint, and "[j]ust a week" after the student-patient's report on April 6, 2018, DePaul "terminat[ed] the parties' contract three years early." FAC ¶ 112. Again, DePaul does not challenge Plaintiffs' assertion of materially adverse actions.[12] Mot. Dismiss Memo. at 7. And again, no matter, as a change to the terms and conditions of "employment" status constitutes a materially adverse action under Title IX. *Fox v. Town of Framingham*, 2016 WL 4771057, at *3 (D. Mass. Sept. 13, 2016).

It is the third element, but-for causation, that is in dispute and where Plaintiffs' First Amended Complaint fails. "[T]o survive a motion to dismiss, [plaintiffs] must provide some allegations to 'allow the Court to infer a causal connection between his treatment and gender bias and raise the possibility of relief under Title IX above the speculative level.'" *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 950 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019). A primary consideration for causation at the motion to dismiss stage is whether the plaintiffs allege some "retaliatory motive" connecting the protected activity and adverse action.

---

[12]Notably, DePaul *does* challenge Plaintiffs' characterization of the 2018 halt of referrals as a "termination" or a "breach of contract." Mot. Dismiss Memo. at 10–11. A "breach" analysis is not required here, as a change in employment status constitutes a "materially adverse action" under Title IX, breach or otherwise. *See Fox*, 2016 WL 4771057, at *3.

*See id.* at 960; *Cardenas v. First Midwest Bank,* 114 F. Supp. 3d 585, 591 (N.D. Ill. 2015) (finding retaliatory motive after the plaintiff explicitly expressed her intent to file for workers' compensation). The Seventh Circuit has considered other circumstantial evidence of retaliation, such as: (1) suspicious timing, ambiguous oral or written statements, behavior towards other employees who are part of a protected group, and other actions; (2) evidence the employer "treated other, similarly situated . . . employees better"; or (3) evidence that the employer's justification was pretextual. *Milligan,* 686 F.3d at 388–89.[13]

Turning first to the alleged protected activities in 2016 and 2017, Plaintiffs allege that Dr. Conviser reported Coach Lenti's abusive behavior to the Title IX Office in fall of 2016. FAC ¶ 101. DePaul argues that Plaintiffs have not and cannot establish but-for causation between the 2016 and 2017 incidents and the 2018 "termination." Mot. Dismiss Memo. at 7–8 (citing *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027 (7th Cir. 1998)) (concluding that the plaintiff could not sustain a claim for retaliation where she complained of harassment on August 23, 1996, was laid off in November 14, 1996, and was not recalled in the spring of 1997, as the time sequence was "insufficient to establish the causation prong of a prima facie case"); *see also Kriss v. Fayette Cnty.,* 504 F. App'x. 182, 188–89 (3d Cir. 2012) (holding that the passage of nine months between the protected activity and alleged retaliation was insufficient to establish causation and stating "we have found, no cases where a gap of more than even two months was found to be unusually suggestive"); *Wadhwa*

---

[13]*Milligan* was a Title VII retaliation case. The Title VII retaliation framework applies equally to Title IX retaliation claims. 686 F.3d at 388.

*v. Sec'y, Dep't of Veterans Affs.*, 505 F. App'x. 209, 215–16 (3d Cir. 2012) (holding passage of one year between protected activity and alleged retaliation insufficient to establish causation); *McNally v. Univ. of Haw.*, 780 F. Supp. 2d 1037, 1054 (D. Haw. 2011) (". . . [T]he period of fifteen to eighteen months between events is too long to suggest a causal link."). The Court agrees. Though not specifically asserted under the Count I "section" of the complaint, Plaintiffs did assert one allegation of *earlier* retaliatory conduct—a slowing of referrals following the 2016 report. FAC ¶ 101. Arguably, this earlier alleged retaliation could close the timing gap with respect to the 2016/2017 protected activities. But, as DePaul notes, DePaul actually renewed its contract with Ascend *after* the 2016 and 2017 reporting incidents. Mot. Dismiss Memo. at 8. This fact weakens the plausibility of ongoing retaliation since 2016. Given the implausibility of ongoing retaliation and no further alleged causation between the 2016/2017 reporting incidents and DePaul's decision to stop referring students in April 2018, these earlier instances do not support a retaliation claim.

This leaves the allegation that at Dr. Conviser's insistence, a member of Ascend's staff counseled a student-athlete patient to report Coach Lenti to DePaul's Title IX Office in April 2018, the core of the retaliation claim. FAC ¶¶ 85–87. This allegation also fails the but-for test because there are no facts to suggest that DePaul was even aware of Plaintiffs' involvement in the student-athlete's report prior to "illegally retaliat[ing] against Dr. Conviser and Ascend by terminating the parties' contract three years early." *Id.* ¶ 97. According to Plaintiffs, the student-athlete reported Coach Lenti's misconduct on April 6, 2018. *Id.* ¶ 87. Plaintiffs further allege,

"upon information and belief," that DePaul's Title IX Office and Athletics Department learned about Dr. Conviser's involvement in the student's report during their investigation of the same, which began on April 19, 2018. *Id.* ¶ 90. However, the alleged retaliation—i.e. the "termination" of the parties' contract—occurred "[j]ust a week after Dr. Conviser's patient reported Coach Lenti to DePaul." *Id.* ¶ 97. In other words, DePaul allegedly retaliated against Plaintiffs for Dr. Conviser's involvement in the student's report before they found out about Dr. Conviser's involvement in the student's report. This is implausible. DePaul could not have retaliated against Plaintiffs for conduct of which it was unaware.

When examining the totality of the circumstances, the lack of retaliatory motive and the attenuated connection between Plaintiffs and the reporting students outweigh any suspicion brought about by the proximity in timing ("termination" one week after the complaint). Plaintiffs do not plausibly allege that but for their actions in counseling the therapist to encourage the student to report, DePaul would not have stopped referring students to Ascend.

The Court concludes that Plaintiffs have failed to allege the claim's third element, as they cannot show a causal relationship between the statutorily protected complaints that they or their patients lodged and the alleged termination of Ascend's agreement with DePaul.

## II. Supplemental Jurisdiction of Counts II and III

The Court dismisses the federal claim under Title IX in Count I, leaving only state law claims in Counts II and III. There is no diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as complete diversity of citizenship does

not appear from the face of the First Amended Complaint. *See* FAC ¶¶ 40–43, 44; *see also Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 758 (7th Cir. 2009) (diversity jurisdiction statute requires complete diversity of citizenship between plaintiff and defendant).

The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). It is within the Court's discretionary authority to decline to exercise supplemental jurisdiction over state law claims once it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see Baig v. Coca-Cola Co.*, 69 F. Supp. 3d 766, 781 (N.D. Ill. 2014), *aff'd*, 607 F. App'x 557 (7th Cir. 2015). Indeed, the Seventh Circuit has stated that in such circumstances, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). As a result, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court, in the exercise of its discretion, declines to assert supplemental jurisdiction over Plaintiffs' remaining state law claims.

### Conclusion

The Court grants DePaul's Motion to Dismiss Plaintiffs' First Amended Complaint [23] for failure to state a claim upon which relief can be granted. The Court concludes that Plaintiffs do not have statutory standing to bring a Title IX claim against DePaul, and as such, Count I is dismissed. Plaintiffs have until April 21, 2021 to file an amended complaint asserting a claim over which the Court has original jurisdiction. If no amended complaint is filed by that date, the dismissal of Count I will automatically convert to one with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims in Counts II and III, and if no amended complaint asserting a claim over which the Court has original jurisdiction is filed by April 21, 2021, Counts II and III will automatically be dismissed without prejudice for refiling in state court.

Franklin U. Valderrama
United States District Judge

Dated: March 31, 2021