**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DR. JENNY H. CONVISER and ) 
ASCEND CONSULTATION IN ) 
HEALTH CARE, LLC, )     Case No. 1:20-cv-03094 
                     ) 
          Plaintiffs, ) 
      v. )     Hon. Franklin U. Valderrama 
                     ) 
DEPAUL UNIVERSITY, ) 
                     ) 
          Defendant. )

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**<u>MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 1

LEGAL STANDARD ....................................................................................................... 3

ARGUMENT .................................................................................................................... 4

I.    The Complaint States a Claim for Title IX Retaliation ........................................... 4

    A.    Plaintiffs Allege the Elements of a Title IX Retaliation Claim ........................ 4

        1.    Plaintiffs Allege They Engaged in Protected Activity ............................ 4

        2.    Plaintiffs Allege the University Took Materially Adverse Action
            Against Them ........................................................................................... 5

        3.    Plaintiffs Allege But-For Causation Between the Protected Activity
            and Adverse Actions ............................................................................... 6

    B.    Plaintiffs Can Assert a Title IX Claim ......................................................... 10

        1.    Title IX Protects All "Person[s]" Who Can State a Claim ................... 10

        2.    The University Is Wrong About Title IX's Reach ................................. 13

            i.    DePaul's Anti-Textualist Approach Is Untenable ...................... 13

            ii.    DePaul Tries to Rewrite Title IX ............................................... 15

            iii.    Title IX's Legislative History Supports a Broad Interpretation ...... 17

            iv.    DePaul's Other Extra-Textual Arguments Fall Flat ................... 20

        3.    Even by the University's Interpretation, Plaintiffs Have a Cause
            of Action ............................................................................................... 22

II.    The Complaint States a Claim for Breach of Contract and the Covenant of
    Good Faith and Fair Dealing .............................................................................. 23

III.    The Complaint States a Claim for Indemnification of First-Party Claims ........... 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Waste Transp., Inc. v. Bellemead Dev. Corp.*,
No. 13 C 01029, 2014 WL 4414510 (N.D. Ill. Sept. 8, 2014)................................................25

*Arora v. Daniels*,
No. 3:17-cv-134, 2018 WL 1597705 (W.D.N.C. Apr. 2, 2018)............................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................4

*Avila v. CitiMortgage, Inc.*,
801 F.3d 777 (7th Cir. 2015) ................................................................................................24

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................................................14, 15

*Bostock v. Clayton Cty.*,
140 S. Ct. 1731 (2020)....................................................................................................13, 17

*Brown v. Illinois Dep't of Human Servs.*,
No. 17-2509, 2017 WL 3887962 (7th Cir. Sept. 1, 2017) ....................................................22

*Brown v. Illinois Dep't of Human Servs.*,
717 F. App'x 623 (7th Cir. 2018) .........................................................................................22

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)..................................................................................................................6

*Burnett v. LFW Inc.*,
472 F.3d 471 (7th Cir. 2006) ..................................................................................................6

*Burton v. Bd. of Regents of Univ. of Wis. Sys.*,
851 F.3d 690 (7th Cir. 2017) ..................................................................................................4

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)..............................................................................................................14

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979)..............................................................................................................20

*Carlson v. CSX Transp., Inc.*,
758 F.3d 819 (7th Cir. 2014) ..........................................................................................7, 8, 9

*Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*,
   745 F.3d 703 (4th Cir. 2014) ................................................................................14

*Collins v. State of Ill.*,
   830 F.2d 692 (7th Cir. 1987) ..................................................................................6

*Condiff v. Hart Cty. Sch. Dist.*,
   770 F. Supp. 2d 876 (W.D. Ky. 2011) ...................................................................5

*Consol. Rail Corp. v. Darrone*,
   465 U.S. 624 (1984) ..............................................................................................14

*Crawford v. George & Lynch, Inc.*,
   No. 10-949-GMS-SRF, 2012 WL 2674546 (D. Del. July 5, 2012) .........................5

*Culver v. Gorman & Co.*,
   416 F.3d 540 (7th Cir. 2005) ..................................................................................8

*Doe v. Brown Univ.*,
   270 F. Supp. 3d 560 (D.R.I. 2017), *aff'd on other grounds*, 896 F.3d 127 (1st
   Cir. 2018) ..............................................................................................................21

*Doe v. Brown Univ.*,
   896 F.3d 127 (1st Cir. 2018) ..........................................................................11, 22

*Doe v. Mercy Catholic Med. Ctr.*,
   850 F.3d 545 (3d Cir. 2017).................................................................................17

*Doe v. Univ. of Kentucky*,
   971 F.3d 553 (6th Cir. 2020) ...............................................................................23

*Douglass v. Garden City Comm. Coll.*,
   No. CV 20-2076-KHV, 2021 WL 2352430 (D. Kan. June 9, 2021) ................11, 23

*Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*,
   693 F.3d 1303 (10th Cir. 2012) ......................................................................11, 14

*Flynn v. Distinctive Homecare, Inc.*,
   812 F.3d 422 (5th Cir. 2016) ...............................................................................14

*Fox v. Pittsburg State Univ.*,
   257 F. Supp. 3d 1112 (D. Kan. 2017) .............................................12, 17, 18, 21

*Franklin v. Gwinnett Cty. Pub. Schs.*,
   503 U.S. 60 (1992).................................................................................................18

*Hauff v. State Univ. of New York*,
   425 F. Supp. 3d 116 (E.D.N.Y. 2019) .................................................................17

*Hefferman v. Illinois Cmty. Coll. Dist. No. 508*,
   No. 00 C 0794, 2000 WL 631309 (N.D. Ill. May 16, 2000) ..................................................14

*Holmes v. Hous. Auth. of Joliet*,
   No. 14 C 3132, 2015 WL 1826676 (N.D. Ill. Apr. 20, 2015)..................................................8

*Horner v. Kentucky High Sch. Athletic Ass'n*,
   43 F.3d 265 (6th Cir. 1994) ...........................................................................................17, 18

*Howard v. Inland SBA Mgmt. Corp.*,
   32 F. Supp. 3d 941 (N.D. Ill. 2014) ...................................................................................6

*Islesboro Sch. Comm. v. Califano*,
   593 F.2d 424 (1st Cir. 1979)............................................................................................16

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005)..................................................................................................*passim*

*Johnson v. McDonald*,
   No. 15-CV-11092, 2020 WL 374679 (N.D. Ill. Jan. 23, 2020)................................................8

*Joll v. Valparaiso Cmty. Schs.*,
   953 F.3d 923 (7th Cir. 2020) .............................................................................................8

*Killingsworth v. HSBC Bank Nevada, N.A.*,
   507 F.3d 614 (7th Cir. 2007) ........................................................................................4, 10

*Kucharik v. Garden City Comm. Coll.*,
   No. CV 20-2190-KHV, 2021 WL 1840067 (D. Kan. May 7, 2021) .....................................11

*LaSalle Bank Nat'l Assoc. v. Paramont Props.*,
   588 F. Supp. 2d 840 (N.D. Ill. 2008) ................................................................................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)..........................................................................................10, 15, 17

*Lopez v. San Luis Valley, Bd. of Co-Op Educ. Servs.*,
   977 F. Supp. 1422 (D. Colo. 1997)...................................................................................21

*Loudermilk v. Best Pallet Co., LLC*,
   636 F.3d 312 (7th Cir. 2011) .............................................................................................8

*Magyar v. Saint Joseph Reg'l Med. Ctr.*,
   544 F.3d 766 (7th Cir. 2008) .............................................................................................7

*N. Haven Bd. of Educ. v. Bell*,
   456 U.S. 512 (1982)..................................................................................................*passim*

iv

*Nat. Collegiate Athletic Ass'n v. Smith*,
    525 U.S. 459 (1999) ................................................................................................. 18

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019) .............................................................................. 13, 17, 19

*O'Leary v. Accretive Health, Inc.*,
    657 F.3d 625 (7th Cir. 2011) ..................................................................................... 5

*Olympian Grp. LLC v. City of Markham*,
    No. 18-CV-04919, 2020 WL 5820024 (N.D. Ill. Sept. 30, 2020) ............................ 5

*Parker v. Franklin Cty. Cmty. Sch. Corp.*,
    667 F.3d 910 (7th Cir. 2012) ................................................................................... 22

*Parkins v. Civ. Constructors of Illinois, Inc.*,
    163 F.3d 1027 (7th Cir. 1998) ................................................................................... 6

*Prey v. Kruse*,
    No. 2:08-CV-287, 2009 WL 10679036 (S.D. Ohio June 9, 2009) .......................... 21

*Preyer v. Dartmouth College*,
    968 F. Supp. 20 (D.N.H. 1997) ............................................................................... 21

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
    870 F.3d 682 (7th Cir. 2017) ................................................................................... 24

*Romeo Cmty. Sch. v. U.S. Dep't of Health, Ed., & Welfare*,
    438 F. Supp. 1021 (E.D. Mich. 1977), *aff'd*, 600 F.2d 581 (6th Cir. 1979) ........... 16

*Rossley v. Drake Univ.*,
    336 F. Supp. 3d 959 (S.D. Iowa 2018), *aff'd on other grounds*, 958 F.3d 679
    (8th Cir. 2020) ........................................................................................................ 21

*Rossley v. Drake Univ.*,
    958 F.3d 679 (8th Cir. 2020) ............................................................................ 11, 22

*Smith v. EMB, Inc.*,
    576 Fed. App'x 618 (7th Cir. 2014) .......................................................................... 7

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ................................................................................................... 6

*Thompson v. N. Am. Stainless, LP*,
    562 U.S. 170 (2011) ............................................................................................. 8, 15

*Tri-State Disposal, Inc., v. Village of Riverdale*,
    369 F. Supp. 3d 866 (N.D. Ill. 2019) ........................................................................ 5

*United States v. Berkos*,
  543 F.3d 392 (7th Cir. 2008) ...................................................................10, 13, 20

*United States v. Grossi*,
  143 F.3d 348 (7th Cir. 1998) ...............................................................................12

*United States v. LaFaive*,
  618 F.3d 613 (7th Cir. 2010) ...............................................................................14

*Vazquez v. Suncast Corp.*,
  No. 18 CV 05002, 2019 WL 2576554 (N.D. Ill. June 24, 2019)......................6, 7

*Volling v. Kurtz Paramedic Servs., Inc.*,
  840 F.3d 378 (7th Cir. 2016) .................................................................................6

*Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*,
  936 N.E.2d 1127 (Ill. App. Ct. 2010) ..................................................................25

*Weeks v. Kansas*,
  503 F. App'x 640 (10th Cir. 2012) .........................................................................5

*Woodruff v. Mason*,
  542 F.3d 545 (7th Cir. 2008) .................................................................................5

**Statutes**

15 U.S.C. § 1125..........................................................................................................15

20 U.S.C. § 1681 ................................................................................................ *passim*

20 U.S.C. § 1687 ................................................................................................ *passim*

42 U.S.C. § 2000e-2....................................................................................................22

1 U.S.C. § 1 ..........................................................................................................12, 14

29 U.S.C. § 701............................................................................................................14

**Other Authorities**

118 Cong. Rec. 5807 (1972) ............................................................................................19

118 Cong. Rec. 5812 (1972) ............................................................................................19

Fed. R. Civ. P. 12(b)(6) ....................................................................................................3

Mark L. Adams, *The Quest for Tenure: Job Security and Academic Freedom,* 56
    Cath. U. L. Rev. 67, 96 (2006) .................................................................................19

S. Rep. No. 100-64 (1987) ..............................................................................................18

Webster's Seventh New Collegiate Dictionary 271 (1972) ............................................19

Webster's Third New International Dictionary of the English Language 743
    (1981) ........................................................................................................................19

## INTRODUCTION

DePaul University ("DePaul" or "the University") hired Dr. Jenny Conviser and her company, Ascend Consultation in Health Care, LLC ("Ascend"), to take care of its student-athletes. But when Plaintiffs tried to do their job by bringing abuses to light, the University responded vindictively, reducing patient referrals and ultimately terminating its relationship with Dr. Conviser and Ascend. That is textbook retaliation. DePaul seeks to avoid liability by ignoring Title IX's plain language and asking this Court to rewrite the statute. But the text is clear: Plaintiffs are "person[s]" who, "on the basis of sex," were "excluded from" DePaul, "denied [its] benefits," and "subjected to discrimination" within the University, an "education program or activity." 20 U.S.C. § 1681(a). And, in retaliating against Plaintiffs, DePaul also breached its contract with Ascend. The Court, then, should permit Plaintiffs' case to proceed.

## FACTUAL BACKGROUND

For more than thirteen years, DePaul University relied on Dr. Conviser to provide specialized mental health care to student-athletes and other members of its athletics program. Second Amended Complaint ("SAC") ¶¶ 30-38. As specified in DePaul's contracts with Dr. Conviser's companies, including Ascend, DePaul referred patients to Dr. Conviser, she and her staff assessed the student-athlete patients and recommended a treatment plan, and DePaul paid the company for its services. *Id*. ¶¶ 31-32. For these purposes, DePaul provided Dr. Conviser an on-campus office and other resources. *Id*. ¶ 36. In addition to her responsibilities to DePaul patients, Dr. Conviser assisted with the University's efforts to comply with National Collegiate Athletic Association ("NCAA") policies and federal law, including Title IX. *Id*. ¶¶ 43-46. DePaul rightfully treated Dr. Conviser as one of its own, sending her to conferences to represent the University and identifying her as "DePaul's provider" of mental health services in an NCAA report. *Id*. ¶¶ 34, 44.

1

Based on her Title IX training and expertise, Dr. Conviser had concerns about DePaul's compliance with the federal civil rights law. *Id*. ¶ 48. When patients told Dr. Conviser or other therapists at Ascend that they had experienced or witnessed abuse, Dr. Conviser helped them understand their rights and options for reporting. *Id*. ¶ 48. She sometimes also sought their permission to report those abuses to DePaul Athletics, and then did so. *Id*.

In the fall of 2016, Dr. Conviser informed DePaul officials that she had learned its famed softball coach, Eugene Lenti, was frequently verbally and physically abusive to his staff and players. For example, he regularly called his female players gendered epithets like "f---ing whores" and "sensitive bitches." *Id*. ¶ 50. DePaul did nothing beyond instructing Dr. Conviser to meet with Lenti and his staff. *Id*. ¶¶ 51-55. Unsurprisingly, that minimalist response was ineffective. In a December 2017 meeting with senior administrators, Dr. Conviser again raised concerns about Lenti's abuses and the University's related Title IX responsibilities—a personally risky move, given that Lenti's sister, DePaul's Athletics Director, was present. *Id*. ¶¶ 42, 61-63. In that meeting, Dr. Conviser also reported that a DePaul coach was having a sexual relationship with a student on his team, *id*. ¶ 65, and that male athletes were hosting recruitment events that included the provision of sexual favors by female DePaul students, *id*. ¶ 64. Dr. Conviser's reports were met with stony silence, then denial. *Id*. ¶ 66.

After that meeting, DePaul retaliated against Dr. Conviser by reducing its referrals to her and Ascend. *Id*. ¶ 70. The University's hostility only grew when, in early 2018, Dr. Conviser reported the sexual assault of a student. *Id*. ¶ 71. Instead of responding with concern and gratitude, DePaul officials attacked Dr. Conviser's professional ethics. *Id*. ¶ 72-75.

For DePaul, the final straw came soon after. On April 6, 2018, in accordance with detailed instructions by Dr. Conviser, an Ascend therapist joined the source of her information to report to

2

DePaul's Title IX Office that Lenti was physically abusing women involved with the softball team. *Id*. ¶ 76. DePaul knew that Dr. Conviser was behind that report within days of receiving it. *Id*. ¶ 77; *see also id*. ¶¶ 41-42. On April 12, 2018, the University launched an investigation into Lenti, during which it confirmed Dr. Conviser's involvement in the April 6 report. *Id*. ¶¶ 78, 80.[1]

DePaul's retaliation against Plaintiffs followed swiftly after the April 6 report. On April 13, 2018—a week after the call to the Title IX Office, and just one day after it started its investigation—DePaul instructed Dr. Conviser to stop treatment for an existing student-athlete patient referred by the University. *Id*. ¶ 81. In short order, DePaul also began to tell student-athletes and DePaul staff that the University would no longer pay for services provided by Plaintiffs. *Id*. ¶ 83. And DePaul's referral rate to Ascend plummeted. In the remaining nine months of 2018 after the report, DePaul referred only three new clients to Ascend. *Id*. ¶ 82. That was a dramatic reduction of referrals compared to 2016, 2017, and even to the first months of 2018. *Id*. By 2019, DePaul had entirely stopped referring new patients to Ascend. *Id*. ¶ 84. In effect, Dr. Conviser's relationship with DePaul was over, even though Ascend's operative contract with DePaul ("the Agreement") was not set to terminate until June 30, 2021. *Id*. ¶¶ 85-86. DePaul never explained why it had changed the terms of its relationship with Plaintiffs. *Id*. ¶ 87. When Dr. Conviser pressed for an answer, a University colleague told her only "don't kill the messenger." *Id*.

## LEGAL STANDARD

On a motion to dismiss brought pursuant to Rule 12(b)(6), the question is whether the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At

---

[1] Though the First Amended Complaint alleged that the investigation began on April 19, 2018, Dr. Conviser's records show she received *confirmation* that the investigation was underway on that date, but that the investigation in fact started no later than April 12, 2018. *See* SAC ¶ 78 n.3 (citing Exh. 1, Popok Dec. at ¶¶ 2-6).

this stage, a court "accept[s] the complaint's well-pleaded allegations as true and draw[s] all favorable inferences for the plaintiff." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

**I.    The Complaint States a Claim for Title IX Retaliation.**

### A.  Plaintiffs Allege the Elements of a Title IX Retaliation Claim.

"Retaliation against a person because that person has complained of sex discrimination is a[] form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). A recipient of federal funds retaliates against a person in violation of Title IX when (1) the person "engage[s] in a statutorily protected activity"; (2) the school "t[akes] a materially adverse action against" the person; and (3) "there exist[s] a but-for causal connection between the two." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). In assessing Title IX retaliation claims, courts look to case law concerning analogous suits brought under Title VII. *See id.* at 695-96.

#### 1.   *Plaintiffs Allege They Engaged in Protected Activity.*

DePaul never seriously contests that Plaintiffs have alleged that they engaged in statutorily protected activity. Nor could it, as this Court has already held: "[S]peaking out against sex discrimination is a recognized protected activity under Title IX." Mem. Op. at 25-26; *see also e.g.*, *Burton*, 851 F.3d at 696. Dr. Conviser repeatedly reported abuses against women students to DePaul officials. *See, e.g.*, SAC ¶¶ 49, 50, 64, 65. She reported, for example, that Lenti regularly called his female players gendered epithets like "f---ing whores" and "sensitive bitches," *id.* ¶ 50, that a DePaul coach was involved in a sexual relationship with a student-athlete on his team, *id.*

¶ 65, that men's athletics teams were hosting recruitment events that promised sexual favors from female DePaul students, *id.* ¶ 64, and that a student had been sexually assaulted, *id.* ¶ 71.

Plaintiffs also encouraged others to report abuses. Dr. Conviser worked with Ascend patients to help them report to the University. SAC ¶ 49. Importantly, she directed an Ascend therapist to call DePaul's Title IX Office, together with the source of the information, to report Lenti's abuses. *Id.* ¶ 76. In doing so, Plaintiffs engaged in further protected activity. *See, e.g.*, *Weeks v. Kansas*, 503 F. App'x 640, 642 (10th Cir. 2012) (noting a worker engages in protected activity when she "actively assist[s] other employees in asserting [Title VII] rights") (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)); *Condiff v. Hart Cty. Sch. Dist.*, 770 F. Supp. 2d 876, 882–83 (W.D. Ky. 2011) (holding that, because "Plaintiff was involved in the opposition of the sexual harassment including the decision to contact school officials[,] . . . she engaged in protected activity"); *see also O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (noting that protected activity involves "some step in opposition to a form of discrimination that the statute prohibits").[2]

### 2. *Plaintiffs Allege the University Took Materially Adverse Action Against Them.*

DePaul also never contests that it subjected Plaintiffs to materially adverse actions. As alleged, Plaintiffs' efforts to bring abuses to DePaul's attention were met first with inaction, then hostility, and then punishment. SAC ¶¶ 50-90. After the December 2017 meeting at which Dr.

---

[2]    DePaul asserts that Ascend cannot engage in protected activity because it is a corporate entity. ECF 49 at 11 n.8. But it is well-established that corporate entities can and do engage in protected activities. *See, e.g.*, *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008); *Olympian Grp. LLC v. City of Markham*, No. 18-CV-04919, 2020 WL 5820024, at *10 (N.D. Ill. Sept. 30, 2020); *Tri-State Disposal, Inc., v. Village of Riverdale*, 369 F. Supp. 3d 866, 881 (N.D. Ill. 2019). The single out-of-circuit district court opinion on which DePaul relies concerns Title VII, which expressly limits its anti-retaliation protections to "employees or applicants." *Crawford v. George & Lynch, Inc.*, No. 10-949-GMS-SRF, 2012 WL 2674546, at *2-*3 (D. Del. July 5, 2012) (quoting 42 U.S.C. § 2000e–3(a)).

Conviser reported a range of abuses, the University began to reduce its referrals, *id.* ¶¶ 61-70, ECF 49 at 12, and treated her with hostility, SAC ¶¶ 72-73. Then, after the April 2018 report, DePaul further slowed and then stopped its referrals to Ascend, announcing to students that the University would no longer pay for Plaintiffs' services. *Id.* ¶ 82-86. It even instructed Dr. Conviser to stop care for an existing patient—the first time it had done so in their lengthy relationship. *Id.* ¶ 81.

These are textbook adverse actions. *See, e.g.*, *Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006) (noting a termination is "unquestionably a materially adverse action"); *Parkins v. Civ. Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (noting a defendant's instruction that other employees not contact the plaintiff may be an adverse action if it results in material harm); *Collins v. State of Ill.*, 830 F.2d 692, 704 (7th Cir. 1987) (holding reduction in work responsibilities was an adverse action); *Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 959 (N.D. Ill. 2014) (holding demotion and termination were adverse employment actions). They are exactly the kinds of action that might "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

3. *Plaintiffs Allege But-For Causation Between the Protected Activity and Adverse Actions.*

The Complaint alleges that DePaul took various materially adverse actions because of Plaintiffs' protected activity. SAC ¶¶ 70, 72-73, 81-85. That, on its own, is enough to survive a motion to dismiss. At this early stage, a plaintiff need not plead facts that would prove every element of a *prima facie* discrimination case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, 514-15 (2002). Rather, they must merely "plausibly allege a causal connection between protected activity and the retaliation." *Vazquez v. Suncast Corp.*, No. 18 CV 05002, 2019 WL 2576554, at *3 (N.D. Ill. June 24, 2019) (citing *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014)); *see also Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 385 & n.3 (7th Cir. 2016)

6

(finding that a complaint stating plaintiffs engaged in protected activity and employee retaliated as a result was adequate for pleadings); *Smith v. EMB, Inc.*, 576 Fed. App'x 618, 620 (7th Cir. 2014) (stating that for a "retaliation claim, [plaintiff] needed to allege only that she was subject to an adverse employment action after she engaged in a specifically identified protected activity" (emphasis removed)).

Although not required, Plaintiffs also allege a series of events from which an inference of but-for causation may be drawn. Most damning is the temporal proximity between Plaintiffs' protected activities and DePaul's adverse actions. DePaul began to reduce referrals after the December 2017 meeting and then, more dramatically, after the April 2018 report, which it knew Plaintiffs had directed. SAC ¶¶ 77, 80; *see also id*. ¶¶ 41-42. Sue Walsh, the official who had been Plaintiffs' primary referral source at the University, never again referred a patient to Ascend after the April 2018 report, *id*. ¶ 83, and there were a mere seven days between the April 2018 report and DePaul's extraordinary directive to Dr. Conviser to stop care for a patient mid-treatment, *id*. ¶ 81. This sequence of events is more than enough to raise an inference of retaliation. *See, e.g.*, *Carlson*, 758 F.3d at 829 (holding plaintiff plausibly pleaded causal relationship between protected activity and adverse action "a few months later"); *Vazquez*, 2019 WL 2576554, at *3 (holding "the one-month interval between [plaintiff's] protected activity and [the adverse action] . . . states a plausible retaliation claim"). The fact that "full execution of the adverse action took a while longer . . . is immaterial" when the initial temporal proximity was so close. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772-73 (7th Cir. 2008). All of the cases on which DePaul relies are factually distinguishable and arise on summary judgment. *See* ECF 49 at 12 (citing cases).

Other suspicious circumstances support an inference of causation. When Dr. Conviser engaged in protected activity—including the December 2017 and early 2018 reports—she faced

antagonistic, hostile reactions, SAC ¶¶ 66, 72-73, which make the alleged retaliatory motive even more plausible. *See Carlson*, 758 F.3d at 829-30; *Holmes v. Hous. Auth. of Joliet*, No. 14 C 3132, 2015 WL 1826676, at *5 (N.D. Ill. Apr. 20, 2015). Although DePaul had previously held Dr. Conviser in great esteem, *id*. ¶¶ 34-27, after she spoke up in early 2018 about a student's assault, senior officials criticized her and her professional ethics, *id*. ¶¶ 73-74, further solidifying the inference of retaliation. *See Culver v. Gorman & Co*., 416 F.3d 540, 546-47 (7th Cir. 2005). Causation may also be inferred from DePaul's departure from its ordinary practices in rapidly changing its long-established referral practices years before its contract with Plaintiffs was set to expire. *See Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 931 (7th Cir. 2020); *Johnson v. McDonald*, No. 15-CV-11092, 2020 WL 374679, at *10 (N.D. Ill. Jan. 23, 2020). And DePaul refused to provide Plaintiffs a non-retaliatory explanation for its change in practice, *id*. ¶ 87, "support[ing] an inference that the real reason must be discriminatory," *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

As to the causal relationship between the April 2018 report and the adverse actions, DePaul argues only that Plaintiffs do not allege a sufficiently close relationship to the source of the reported information to state a claim for "third-party retaliation." ECF 49 at 9-11. But Plaintiffs do not need to state a "third-party" claim, which arises when a plaintiff is subject to an adverse action for protected activity taken by a different person. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173-75 (2011). Here, Plaintiffs allege they were retaliated against for their *own* protected activities: reports they made directly and their efforts, known to DePaul, to ensure others reported. *Supra* pp. 4-5, 6-8. That said, DePaul's adverse actions against Plaintiffs would suffice to dissuade the

8

therapist who facilitated the April 2018 report from doing so. *See* SAC ¶ 76. After all, her livelihood depended in part on Plaintiffs' continued business from DePaul.[3]

As to the earlier reports, DePaul's "parsing of events los[es] sight of the bigger picture, which showed an ongoing pattern of retaliation." *Carlson*, 758 F.3d at 829. It also ignores relevant allegations. DePaul asserts, for example, that Plaintiffs allege no retaliation prior to the University's effective termination of the contract, ECF 49 at 12-13, and that Dr. Conviser never "reported anything," *id.* at 11, both of which are false, *see* SAC ¶¶ 49, 50, 64, 65, 69-75. The University also impermissibly presses the Court to draw inferences in favor of the University, rather than Plaintiffs.[4] For example, DePaul suggests the Court should infer from the University's renewal of Plaintiffs' contract in 2017 that its later adverse actions were not connected to any pre-renewal protected activities. *See* ECF 49 at 13. But the Court should instead infer that the "routine[]" renewal reflected only that the University's growing anger had not yet reached such a boil that DePaul was ready to fire its specialized mental health provider—far from a sign that it welcomed Plaintiffs' protected activities. *See* SAC ¶¶ 31, 59. Similarly, DePaul argues that this Court should credit DePaul's story that it laudably "encouraged Conviser to address her concerns directly with Lenti," rather than "dismissing [her] concerns." ECF 49 at 13. But the Court should instead infer that the University's refusal to launch an investigation or take similarly meaningful action demonstrated its desire to bury its head in the sand. *See* SAC ¶ 51. Drawing all reasonable

---

[3]      DePaul casts doubt on the role the Ascend therapist played in this report, suggesting that "join[ing]" the call did not constitute "ma[king]" the report. ECF 49 at 3 n.4. Such a parsimonious reading of the pleadings is inappropriate at this stage. Regardless, facilitating a report is itself a protected activity. *See supra* p. 5.

[4]      The University also attacks the credibility of Plaintiffs' claims, *see* ECF 49 at 1, which is utterly inappropriate on a motion to dismiss.

inferences in Plaintiffs' favor, as the Court must at this early stage, Plaintiffs have sufficiently alleged a claim of retaliation in violation of Title IX. *See Killingsworth*, 507 F.3d at 618.[5]

**B. Plaintiffs Can Assert a Title IX Claim.**

DePaul argues that Plaintiffs cannot bring a claim under Title IX because they do not have "statutory standing"—that is, they have no "cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). "That question requires [the Court] to determine the meaning of the congressionally enacted provision creating a cause of action." *Id.*[6] Here, the meaning is clear from Title IX's text, which, on its face, protects Plaintiffs.

1. *Title IX Protects All "Person[s]" Who Can State a Claim.*

The starting point of any inquiry into a statute's application is its text. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008); *see also Lexmark*, 572 U.S. at 128 (noting courts "apply traditional principles of statutory interpretation" in determining who may bring suit under a statute). "Absent clearly expressed Congressional intent to the contrary, the plain language should be conclusive." *Berkos*, 543 F.3d at 396. That principle is no less true for Title IX: The Supreme Court has specifically instructed courts to "accord it a sweep as broad as its language." *N. Haven*

---

[5]     DePaul also contends that it is "questionable" whether Plaintiffs can establish a causal relationship between the December 2017 meeting and a subsequent reduction in referrals. ECF 49 n.9. DePaul is welcome to explore this issue in discovery. But the Court can easily infer from the allegations that Sue Walsh—Plaintiffs' primary referral source—learned about the meeting from someone else, that Walsh was instructed to reduce referrals by someone who knew about the meeting, or that the reduction was due to a decrease in referrals from sources other than Walsh. *See* SAC ¶ 37, 83.

[6]     In *Lexmark*, the Supreme Court disapproved of the term "statutory standing" to describe the inquiry here. Justice Scalia wrote: "We have on occasion referred to this inquiry as 'statutory standing' and treated it as effectively jurisdictional. . . . . But it . . . is misleading, since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Lexmark*, 572 U.S. at 128 n.4 (internal quotation marks and citations omitted). The question posed, like so many others that courts must address on a motion to dismiss, is simply whether a plaintiff can state a claim under the statute. *See id.* at 128.

*Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982); *see also Jackson*, 544 U.S. at 175 ("[B]y using such a broad term, Congress gave the statute a broad reach.").

So, to the text. Title IX provides that "[n]o *person* in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). On its face, the statute's text does not limit plaintiffs to those with a particular relationship to the institution. *Jackson*, 544 U.S. at 179 n.3 ("Title IX's beneficiaries plainly include *all* those who are subjected to 'discrimination' 'on the basis of sex.'" (emphasis added)); *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 693 F.3d 1303, 1311 (10th Cir. 2012) ("Title IX does not limit its coverage at all, outlawing discrimination against any 'person'"); *see also Rossley v. Drake Univ.*, 958 F.3d 679, 684 (8th Cir. 2020) ("Title IX . . . protects *individuals* who suffer retaliation after reporting instances of sex discrimination" (emphasis added)); *Doe v. Brown Univ.*, 896 F.3d 127, 132 n.6 (1st Cir. 2018) (noting the broad range of plaintiffs who can bring Title IX claims, including "[m]embers of the public"); *Douglass v. Garden City Comm. Coll.*, No. CV 20-2076-KHV, 2021 WL 2352430, at *5 (D. Kan. June 9, 2021) ("In the context of Title IX retaliation, [a] plaintiff is not required to plead that she is a . . . student or faculty member"); *Kucharik v. Garden City Comm. Coll.*, No. CV 20-2190-KHV, 2021 WL 1840067, at *5 (D. Kan. May 7, 2021) (same). The group of people Title IX protects from sex discrimination includes anyone "excluded from participation in, . . . denied the benefits of, or," most broadly, "subjected to discrimination under" an entity covered by Title IX. 20 U.S.C. § 1681(a).

No case demonstrates this better than *North Haven Board of Education v. Bell*. Holding that Title IX applies to school employees, the Supreme Court determined that the statute's text

11

"neither expressly nor impliedly excludes employees from its reach." 456 U.S. at 521. "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of" the statute, the Court reasoned, but it had not done so. *Id*. Thus, "the statutory language . . . favor[ed] inclusion of employees." *Id*. at 522. The same reasoning applies here: If Congress had intended to restrict Title IX's protection to certain classes of "person[s]," and exclude independent contractors, Congress could have said so. But it did not.

The Civil Rights Restoration Act (CRRA) confirms Title IX's broad reach in defining "program or activity." 20 U.S.C. § 1687. The CRRA "amended Title IX to require *the entire entity* receiving federal funds to abide by the statute's substantive rules." *United States v. Grossi*, 143 F.3d 348, 350 (7th Cir. 1998) (emphasis added); *see also Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1125-26 (D. Kan. 2017) (noting "Congress intended for Title IX to broadly cover the entirety of the institution"). It specifies that "the term 'program or activity' . . . mean[s] all the operations of . . . a . . . university," so long as "any part of [the recipient] is extended Federal financial assistance." 20 U.S.C. § 1687. DePaul as whole, then, is a single "program or activity." *Id*. And because it is an educational institution, the University is an "education program or activity." 20 U.S.C. § 1681(a). Thus, under Title IX, as amended by the CRRA, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under [DePaul University]." *Id.* The viability of a plaintiff's claim does not depend on where within the University the discrimination occurred.

Plaintiffs, then, surely can state a claim under Title IX. As described above, retaliation for reporting sex discrimination is a form of sex discrimination prohibited by Title IX. *Jackson*, 544 U.S. at 173. Plaintiffs are both "persons" within the meaning of the Dictionary Act. 1 U.S.C. § 1. And DePaul's athletics program is certainly a part of DePaul, an "education program or

12

activity." 20 U.S.C. § 1681(a). The retaliation that Plaintiffs faced served to "exclude[ them] from participation in" DePaul's athletics program, *id.*, when DePaul stopped referring patients to Ascend, SAC ¶¶ 84-86. The retaliation also "denied [Plaintiffs] the benefits," 20 U.S.C. § 1681(a), including the financial benefits, of DePaul's athletics program, since Plaintiffs were no longer paid for treating patients within DePaul, SAC ¶¶ 82-86. And, through the retaliation, DePaul "subjected [Plaintiffs] to discrimination under" DePaul's athletics program. 20 U.S.C. § 1681(a); *see also N. Haven*, 456 U.S. at 520-21 ("[A] female employee who works in a federally funded education program is 'subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues.").[7] The text is therefore clear that Plaintiffs can sue under Title IX.

2. *The University Is Wrong About Title IX's Reach.*

i. *DePaul's Anti-Textualist Approach Is Untenable.*

To achieve its desired outcome, DePaul asks this Court to ignore Title IX's text and, with it, a fundamental canon of statutory construction. *See* ECF 49 at 5. That strategy is a non-starter, given the wall of authority requiring courts to give statutes the plain meaning dictated by their text. *See, e.g.*, *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020); *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539, 543 (2019); *Berkos*, 543 F.3d at 396. A broadly written statute, then, is a statute of broad application, not a statute whose text should be overlooked in the interest of a party's desired outcome or a court's policy judgment. *See, e.g.*, *Bostock*, 150 S. Ct. at 1740-41; *Jackson*, 544 U.S. at 175; *N. Haven*, 456 U.S. at 521.

---

[7] *North Haven* was decided before the CRRA. 20 U.S.C. § 1687. Now, a Title IX plaintiff need not "directly participate in federal programs or . . . directly benefit from federal grants, loans, or contracts [to] clearly fall within the first two protective categories described in [20 U.S.C. § 1681(a)]." *N. Haven*, 456 U.S. at 521.

Take the word "person." DePaul reads it out of the statute, replacing it with "student, employee, and maybe parent." *See* ECF 49 at 6-7. Perhaps the term "person" is "of limited use," *id*. at 5, in DePaul's efforts to avoid liability, but the word is both useful and fundamental to interpreting Title IX's scope. Plenty of laws use the word "person," and courts give the term its ordinary broad meaning, often in consultation with the Dictionary Act. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 707-719 (2014); *Bennett v. Spear*, 520 U.S. 154, 164-65 (1997); *United States v. LaFaive*, 618 F.3d 613, 616-17 (7th Cir. 2010). That is exactly what the Court should do here: recognize that, in using the term "person," "Title IX does not limit its coverage at all." *Elwell*, 693 F.3d at 1311.[8]

Such a broad reading is consistent with courts' interpretation of two civil rights statutes analogous to Title IX. For example, courts have held that Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq*., protects independent contractors because its plain language does not exclude them from the class of protected "individuals." *See Flynn v. Distinctive Homecare, Inc.*, 812 F.3d 422, 427-32 (5th Cir. 2016) (citing cases); *see also Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632 n.13 (1984) (noting Section 504 and Title IX are modeled on Title VI of the Civil Rights Act of 1964); *Hefferman v. Illinois Cmty. Coll. Dist. No. 508*, No. 00 C 0794, 2000 WL 631309, at *3 (N.D. Ill. May 16, 2000) (permitting Title VI claim by independent contractor).[9]

---

[8]     Where the statutory text indicates a specific congressional intent to depart from the Dictionary Act definition—which Title IX does not—courts sometimes read "person" to exclude corporations. *See Burwell*, 573 U.S. at 707-08; *see also Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 713-15 & n.4 (4th Cir. 2014) (holding corporation is a "person" that can bring Title VI claim). But nowhere does "person" mean some type of natural persons but not others. *Cf. Burwell*, 573 U.S. at 709 ("No known understanding of the term 'person' includes some but not all corporations.").

[9]     Courts that have held that independent contractors cannot bring Section 504 claims did so based on a provision of Section 504 that is absent from Title IX. *See Flynn*, 812 F.3d at 429-30.

DePaul suggests that, because Title IX "does not expressly prohibit retaliation" or "create a private right of action," the Court can ignore its text. ECF 49 at 5. Not so. Title IX does not expressly prohibit firing an employee for taking maternity leave, yet the Supreme Court took the plain language as its guide in *North Haven*. *See* 456 U.S. at 518, 520-22. And in recognizing retaliation as a form of discrimination prohibited, though not named, by Title IX, the Supreme Court explained it "reach[ed] this result based on the statute's text." *Jackson*, 544 U.S. at 178.

The "zone of interest" doctrine also does not permit the University to overlook Title IX's plain language. Courts "apply traditional principles of statutory interpretation" in determining who may bring suit under a statute. *Lexmark*, 572 U.S. at 128. When a statute's text does not clearly define who can bring suit—often because, unlike Title IX, it does not specify what injuries give rise to a claim—courts will sometimes inquire whether a plaintiff is within the "zone of interest." *See, e.g.*, *id.* at 129-32 (conducting zone of interest analysis for case brought under 15 U.S.C. § 1125, which provides a private right of action to anyone who "believes that he or she is likely to be damaged"); *Thompson*, 562 U.S. at 177-78 (conducting zone of interest analysis for case brought under Title VII, which provides a private right of action for a person "aggrieved"); *cf.* 20 U.S.C. § 1681(a) (identifying three specific types of injuries that may give rise to a claim). As with any other exercise in statutory interpretation, when—as here—a statute's text provides the answer, that is the end of the inquiry. *See Lexmark*, 572 at 131. Because *North Haven* specifically instructed courts to give Title IX the breadth dictated by its text, 456 U.S. at 521, it is exactly the kind of statute for which, the Supreme Court has explained, a "zone of interest" inquiry has no limiting effect. *See Lexmark*, 572 U.S. at 129-30; *Bennett*, 520 U.S. at 164.

### ii. DePaul Tries to Rewrite Title IX.

Where DePaul purports to interpret text, it instead tries to rewrite it. The University argues (1) that "the phrase 'education program or activity' limits Title IX's scope to those who seek or

receive 'educational benefits' from the defendant," ECF 49 at 5, and (2) that Title IX applies only to the parts of a university that are "educational in nature," *id*. at 8. DePaul is wrong on both counts.

*First*, the University's "educational benefit" requirement is plainly inconsistent with *North Haven*, which held that employees are protected by Title IX. *See* 456 U.S. at 520-21. "[A] female employee who works in a federally funded education program," for example, "is 'subjected to discrimination under' that program if she is paid a lower salary for like work . . . than are her male colleagues." *Id*. at 521. She cannot be said to lose out on an "educational benefit." Rather, to use DePaul's words, hers is a "purely monetary interest." ECF 49 at 8. But that was enough, the Supreme Court said. *N. Haven.*, 456 U.S. at 520-21. For all the same reasons *North Haven* held an employee can bring a Title IX claim, so can an independent contractor like Plaintiffs.[10]

DePaul's reading also simply cannot be squared with Title IX's text. "[E]ducation" modifies "program or activity," not "benefits." 20 U.S.C. § 1681(a). And Title IX does not limit its scope to a school's "beneficiaries," instead extending its protection to those "excluded from participation" or "subjected to discrimination." *Id*.; *see also N. Haven*, 456 U.S. at 521 (noting Title IX does not limit its protections to recipients' "beneficiar[ies]"). Perhaps DePaul would like Title IX to read:

> No person in the United States shall, on the basis of sex, ~~be excluded from participation in,~~ be denied the [*educational*] benefits of~~, or be subjected to discrimination under~~ any education program or activity receiving Federal financial assistance.

Rewriting Title IX, though, is Congress's job, not the Court's, and certainly not the University's. "[O]nly the words on the page constitute the law adopted by Congress and approved by the

---

[10]     Here, the University's reasoning mirrors the *North Haven* dissent, *see id*. at 541-52 (Powell, J., dissenting) (explaining view that Title IX only protects certain classes of beneficiaries), and the cases *North Haven* abrogated, *see, e.g.*, *Islesboro Sch. Comm. v. Califano*, 593 F.2d 424, 426 (1st Cir. 1979); *Romeo Cmty. Sch. v. U.S. Dep't of Health, Ed., & Welfare*, 438 F. Supp. 1021, 1031-31 (E.D. Mich. 1977), *aff'd*, 600 F.2d 581 (6th Cir. 1979).

President. If judges could add to, remodel, update, or detract from old statutory terms . . . , [they] would risk amending statutes outside the legislative process reserved for the people's representatives." *Bostock*, 150 S. Ct. at 1738; *see also New Prime*, 139 S. Ct. at 539 ("[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands" (internal quotation marks omitted)). "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created . . . ." *Lexmark*, 572 U.S. at 128 (citation omitted).

*Second*, DePaul is wrong that Title IX only applies to distinct parts of the University that are "educational in nature." As explained above, DePaul, taken as a whole, is a single "education program or activity" subject to Title IX. *Supra* p. 12. DePaul would be correct if Title IX instead prohibited sex discrimination "under any education [*component of a*] program or activity receiving Federal financial assistance." But that is not what the statute says. Rightfully, then, DePaul's argument has been roundly rejected by other courts. *See Hauff v. State Univ. of New York*, 425 F. Supp. 3d 116, 132-33 (E.D.N.Y. 2019); *Fox*, 257 F. Supp. 3d at 1125-26; *see also Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994).[11]

   iii.   *Title IX's Legislative History Supports a Broad Interpretation.*

Where a statute's meaning is clear on its face, a court need look no further. *See, e.g.*, *Bostock*, 140 S. Ct. at 1738. But even if DePaul were right that the Court must consider Title IX's

---

[11]   Where the recipient of federal funds is a school, Title IX's use of the word "education" might seem superfluous. But the CRRA defines "program or activity" to encompass many different entities, including, for example, private corporations. 20 U.S.C. § 1687(3). In that case, the adjective "education" narrows the number of "programs or activities" subject to Title IX because most corporations are not "education corporations." *See, e.g.*, *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 553-36 (3d Cir. 2017) (explaining how "education" limits Title IX's application to non-school recipients). "[E]ducation" serves a limiting function, just not one at issue here.

legislative history, that record only confirms that Congress meant what it wrote in drafting a statute of broad application, and that Plaintiffs have a cause of action under Title IX. The CRRA Senate Report notes "[t]he inescapable conclusion is that Congress intended that . . . Title IX . . . be given the broadest interpretation." S. Rep. No. 100-64, at *7 (1987). "Indeed, the word 'broad' is used 35 times in the legislative history of the [CRRA] alone." *Fox*, 257 F. Supp. 3d at 1125.

In terms of *what* Title IX covers, Congress enacted the CRRA in response to a Supreme Court ruling narrowing the scope of Title IX to only the specific university programs and activities that received federal funds. *Nat. Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 n.4 (1999). Congress thus clarified that Title IX was intended to protect plaintiffs connected not only to "traditional educational operations" but also, for example, "campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities." S. Rep. No. 100-64, at *17 (1987)— as the Sixth Circuit has put it, "the furthest reaches of an institution's programs," *Horner*, 43 F.3d at 272. When Congress said "all the operations . . . of a . . . university," 20 U.S.C. § 1687, it meant all the operations of a university. The Court should "not defeat that purpose by recognizing artificial distinctions in the structure or operation of an institution." *Horner*, 43 F.3d at 272.[12]

In terms of *whom* Title IX protects, the legislative history demonstrates that Congress intended all members of a university community to benefit from the statute. Statements by Senator Bayh, who sponsored Title IX, show that he meant Title IX to address "discrimination in

---

[12]     Further telling is what Congress did *not* do when it enacted the CRRA. By 1987, the Supreme Court had held that Title IX should be given "a sweep as broad as its language," and so its protections were not limited to certain classes of "person[s]." *N. Haven*, 456 U.S. at 535-36. If Congress had wanted to correct the record and narrow the statute's reach, the CRRA was its chance to do so. Yet Congress decided, at that juncture, to "broaden[] the coverage of the[] antidiscrimination provisions of [Title IX]" and did so "[w]ithout in any way altering the existing rights of action and corresponding remedies" available to victims of discrimination. *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 73 (1992).

18

employment within an institution." 118 Cong. Rec. 5812 (1972). He did not limit himself to a

certain kind of worker. *Id.* (noting Title IX would protect "a member of a faculty or whatever");

118 Cong. Rec. 5807 (1972) (noting Title IX would cover "employment practices for faculty and

administrators"). "In the area of employment," he emphasized, "we permit no exceptions." 118

Cong. Rec. 5812. Title IX, then, was meant to protect University staff like Dr. Conviser.

Perhaps DePaul thinks that, in using the word "employment," Senator Bayh indicated an

intent to exclude independent contractors. To be sure, "employee" shares an etymological root

with "employment" that "independent contractor" does not. *New Prime*, 139 S. Ct. at 541-52. But,

as the Supreme Court has explained, a reference to "employment" does not "necessarily imply the

existence of an employer-employee relationship" to the exclusion of independent contractors. *Id.*

at 542. Instead, "employment" has historically encompassed "[a]ll work . . . whether or not the

common law criteria for a master-servant relationship happened to be satisfied." *Id.* at 541. Indeed,

at the time Senator Bayh made his remarks, "employment" was defined by Webster's Dictionary

to include "work" as in "the employment of the contractor." Webster's Third New International

Dictionary of the English Language 743 (1981); *see also New Prime*, 139 S. Ct. at 540 n.1

(collecting historical definitions of "employment"); Webster's Seventh New Collegiate Dictionary

271 (1972) (defining "employment" as a synonym for "work"). Plus, the specific types of workers

to which Senator Bayh referred, such as faculty, are sometimes independent contractors, as was

true at the time of Title IX's passage. *See* Mark L. Adams*, The Quest for Tenure: Job Security and

Academic Freedom,* 56 Cath. U. L. Rev. 67, 96 (2006). With his commitment to "no exceptions,"

Senator Bayh's remarks are most naturally read to include all university workers. They certainly

do not evidence so clear an intent to exclude independent contractors that the Court should

disregard the plain, expansive text. *See Berkos*, 543 F.3d at 396 ("Absent clearly expressed Congressional intent to the contrary, the plain language should be conclusive.").

> iv.     *DePaul's Other Extra-Textual Arguments Fall Flat.*

DePaul advances a few other thinly reasoned arguments why Title IX provides only students, employees, and parents—and not Plaintiffs—with a cause of action. None passes muster.

*First*, DePaul wrongly suggests that *Jackson*, the case in which the Supreme Court recognized Title IX prohibits retaliation, is cabined to employees and students. ECF 49 at 6. *Jackson*'s reasoning did not turn on the plaintiff-coach's tax classification; it would have followed just the same if he had been an independent contractor. *See Jackson*, 544 U.S. at 173-185. Indeed, the Court was explicit that "Title IX's beneficiaries plainly include *all* those who are subjected to 'discrimination' 'on the basis of sex.'" *Id*. at 179 n.3 (emphasis added). And, reflecting the "broadly worded" statute, *Jackson* repeatedly uses the word "complainant"—rather than, say, "student or employee"—to refer to retaliation victims who may state a claim. *Id*. at 174, 179. *Jackson*'s holding, then, is no more limited to employees than it is limited to basketball coaches.

*Second*, the University says that Title IX only protects "students, employees, and (in some limited circumstances) parents" because they are the only people "who actually participate in educational programs." ECF 49 at 6. DePaul's proposed restriction to "participants" has no basis in the text, which only uses the word "participation" (or any variant) in protecting those "*excluded from* participation in" the recipient. 20 U.S.C. § 1681(a) (emphasis added); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 680-709 (1979) (recognizing that excluded applicants may bring claims under Title IX). But, more important, the University does not and cannot provide any reason why independent contractors, categorically, may not "participate." If a tenured professor "participates" in the university, surely the same goes for adjunct faculty (who are contractors). If a psychologist employed by a school to treat its students is a "participant," so, too, are Plaintiffs.

*Third*, and relatedly, the University observes that "a plaintiff must assert . . . that the plaintiff was denied access to or participation in" an education program or activity. ECF 49 at 6-7 (emphasis removed). Of course, any plaintiff must allege "exclu[sion] from participation in, [denial of] the benefits of, or . . . discrimination under an[] education program or activity." 20 U.S.C. § 1681(a). But there is, again, no reason why an independent contractor could not do so. After all, Plaintiffs have successfully alleged here that they were "denied access to [and] participation in" DePaul's athletics program, and "subjected to discrimination" within it. *Supra* Part I(A). The inquiry is a case-by-case, fact-dependent one not susceptible to categorical rules.

*Finally*, none of the cases DePaul cites would change the outcome here. Some are easily distinguishable, despite some inaccurate dicta. *See Rossley v. Drake Univ.*, 336 F. Supp. 3d 959, 970 (S.D. Iowa 2018) (dismissing Title IX claim brought by plaintiff who did not allege any exclusion from the defendant, deprivation of its benefits, or discrimination within its program or activity), *aff'd on other grounds*, 958 F.3d 679 (8th Cir. 2020); *Arora v. Daniels*, No. 3:17-cv-134, 2018 WL 1597705, at *8 (W.D.N.C. Apr. 2, 2018) (same); *Prey v. Kruse*, No. 2:08-CV-287, 2009 WL 10679036, at *1-*2 (S.D. Ohio June 9, 2009) (same); *Lopez v. San Luis Valley, Bd. of Co-Op Educ. Servs.*, 977 F. Supp. 1422, 1426 (D. Colo. 1997) (same). Another is wrongly decided. *See Preyer v. Dartmouth College*, 968 F. Supp. 20, 25 (D.N.H. 1997); *see also Fox*, 257 F. Supp. 3d at 1125-26 (explaining *Preyer* "entirely misreads the [CRRA]"). And two are district court opinions that were affirmed on alternative grounds by opinions that instead support Plaintiffs' position. *See Rossley*, 336 F. Supp. 3d at 970-71, *aff'd on other grounds*, 958 F.3d 679 (8th Cir. 2020); *Doe v. Brown Univ.*, 270 F. Supp. 3d 560, 560-61 (D.R.I. 2017), *aff'd on other grounds*,

896 F.3d 127 (1st Cir. 2018). [13] Most important, none of DePaul's cases are controlling law. The only Seventh Circuit opinion that arguably supports the University's position is non-precedential, with a single unexplained line suggesting prospective vendors cannot bring Title IX claims. *See Brown v. Illinois Dep't of Human Servs*., 717 F. App'x 623, 625-26 (7th Cir. 2018). There, the *pro se* appellant never advanced any argument at all about her Title IX claim, let alone one that discussed the statute's application to non-employees. *See generally* Br. of Appellant, *Brown v. Illinois Dep't of Human Servs*., No. 17-2509, 2017 WL 3887962 (7th Cir. Sept. 1, 2017). So that decision is hardly a harbinger of how the Seventh Circuit would rule in this case. [14]

3. *Even by the University's Interpretation, Plaintiffs Have a Cause of Action.*

DePaul is wrong the on law. But even its rewritten version of Title IX provides Plaintiffs a cause of action. It would be no problem for Plaintiffs if, contrary to the plain text of the CRRA, Title IX only covered certain parts of the University. There can be no doubt that Title IX applies to school athletics programs, the part of the University within which Plaintiffs worked and suffered discrimination. *See, e.g.*, *Parker v. Franklin Cty. Cmty. Sch. Corp*., 667 F.3d 910, 915-22 (7th Cir. 2012). Indeed, *Jackson* stemmed from a coach's whistleblowing about disparate treatment of girls' and boys' sports. 544 U.S. at 171-172.

---

[13]     In *Rossley*, the Eighth Circuit adopted the correct, broad interpretation: "Title IX . . . protects *individuals* who suffer retaliation after reporting instances of sex discrimination." 958 F.3d at 684 (emphasis added). And in *Brown University*, the First Circuit clarified that any person who seeks to participate in a university's offerings—even "members of the public" who attend "sporting events"—may be a proper Title IX plaintiff. 896 F.3d at 132 n.6. Under that same test, the *Brown University* plaintiff might have been able to state a claim. But the only argument she pressed concerned exclusion from a different university, not the defendant; she was assaulted at Brown University while visiting its campus and said Brown's failure to address the assault appropriately caused her to withdraw from Providence College, where she was enrolled. *Id*. at 132.

[14]     *Brown* appears to assume that Title IX's scope mirrors Title VII's, but Title VII's inapplicability to independent contractors flows from the text of the statute, which refers specifically to "employers [and] employees," 42 U.S.C. § 2000e-2(a)(2).

Likewise, even if Title IX only covered education and employment, Plaintiffs could still bring suit. There is nothing in the text, legislative history, or case law to suggest Title IX draws a distinction between workers based on their technical classification. *See supra* pp. 11-12, 15-17 (text), 17-20 (legislative history), 20, 21-22 (case law). For any purpose relevant to Title IX, then, Dr. Conviser was indistinguishable from a DePaul employee. From her on-campus office, Dr. Conviser provided crucial mental health care to DePaul student-athletes and staff necessary for the University to meet NCAA expectations. *See* SAC ¶¶ 30-36. DePaul sent her to NCAA conferences as its representative, holding her out as part of the University. *Id.* ¶ 44. She played an integral role in the University's other compliance efforts, including with respect to Title IX. *Id.* ¶ 43-47. And it was precisely because of Plaintiffs' deep and extensive relationship with the DePaul community that they learned about abuses within the athletics program. *See id.* ¶ 48. Indeed, Dr. Conviser is just the kind of university worker who is ideally equipped to enable Title IX's enforcement scheme, which is dependent on individual reporting. *See Jackson*, 544 U.S. at 180. Adults working in schools "are often in the best position to vindicate the rights of [] students because they are better able to identify discrimination to the attention of administrators." *Id.* at 181; *see also Douglass*, No. CV 20-2076-KHV, 2021 WL 2352430, at *5 (noting the same in Title IX retaliation suit brought by school volunteer). That is no less true for an independent contractor than an employee. *Cf. Doe v. Univ. of Kentucky*, 971 F.3d 553, 558 (6th Cir. 2020) (holding "district court's decision was too rigid" in dismissing Title IX claim on the basis that the plaintiff was not technically enrolled at the defendant, even though she was functionally indistinguishable from a student).

## II. The Complaint States a Claim for Breach of Contract and the Covenant of Good Faith and Fair Dealing.

Plaintiffs allege all elements of a breach of contract claim necessary to survive a motion to dismiss. Under Illinois law, "[t]he elements of a claim for breach of contract are (1) the existence

of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015). In determining a contract's scope, courts look to "the language of a contract alone," which "is the best indication of the parties' intent." *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017). The Complaint alleges (1) the parties had a valid and enforceable Agreement, SAC ¶¶ 59, 105-09; (2) Ascend performed its duties under the Agreement, *e.g.*, *id.* ¶¶ 34-35; (3) DePaul breached the Agreement by improperly terminating it contrary to the Agreement's express terms, *id.* ¶¶ 82-89; and (4) Ascend suffered injury because of DePaul's breach, *id.* ¶¶ 82-86, 116. DePaul argues that it did not breach the Agreement because it had no obligation to refer patients to Ascend due to the Agreement's discretionary language and non-exclusivity terms. But that misses the point. Ascend alleges that DePaul breached the Agreement by terminating it in violation of the contract's plain terms, which require prior written notice and a cure period and only permitted termination for specific enumerated reasons. *See* SAC ¶ 89. DePaul's reliance on *Royal Consumer Products LLC v. Walgreen Company* is unpersuasive because the contract in question there lacked any analogous termination clause identifying permissible reasons for termination or even an identified duration. *See* 2019 WL 1595889, at *3-*4 (N.D. Ill. April 15, 2019).

Plaintiffs also state a claim for breach of Illinois' implied covenant of good faith and fair dealing. To establish such a breach, "the complaining party must show that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008). Here, the Complaint properly alleges all the elements of a good

faith and fair dealing covenant and its breach. The Agreement provides DePaul with discretion to perform an obligation. ECF 49-1 ¶ 2(a). For DePaul to reduce and then end patient referrals in response to Plaintiffs' efforts to bring abuse to light, in a manner inconsistent with the reasonable expectations of the parties developed over the course of a thirteen-year relationship, constitutes bad faith in exercising its rights under the Agreement. SAC ¶¶ 61-88.

## III. The Complaint States a Claim for Indemnification of First-Party Claims.

Ascend has properly stated a claim for indemnification. The indemnification provision in the Agreement is clear: A party shall be indemnified in the event of a "breach of promise, or breach of covenant by the Indemnifying Party. . . arising out of or related to the Indemnifying Party's performance of its obligations." SAC ¶ 121. On its face, then, this clause is not limited to third-party claims. It is well-settled that "[a] party wishing to narrow an indemnification clause to third-party damage is obligated to limit . . . the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves." *Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*, 936 N.E.2d 1127, 1133 (Ill. App. Ct. 2010)*. The cases cited by DePaul in this regard are inapposite because they rely on specific contractual terms that, in the context of the contract at issue, made it clear that they only applied to third-party claims, or were resolved on summary judgment rather than on a motion to dismiss. *See* ECF 49 at 14-15; *see also Allied Waste Transp., Inc. v. Bellemead Dev. Corp.*, No. 13 C 01029, 2014 WL 4414510, at *7 (N.D. Ill. Sept. 8, 2014) ("Whether a particular indemnification agreement actually does cover claims by a party depends on the language of the contract.").

## CONCLUSION

For the reasons set forth above, the Court should deny Defendant's motion to dismiss.

Respectfully submitted,


/s/ Adele P. Kimmel
Adele P. Kimmel, Esq.*
Alexandra Z. Brodsky, Esq.*
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Facsimile: (202) 232-7203

Michael S. Popok, Esq.*
**ZUMPANO PATRICIOS & POPOK, PLLC**
417 Fifth Avenue, Suite 826
New York, NY 10016
Telephone: (212) 381-9999
Facsimile:  (212) 320-0332

Art Bresnahan, Esq.
**ZUMPANO PATRICIOS & BRESNAHAN, LLC**
Law Firm No. 13698
829 N Milwaukee Avenue
Chicago, IL 60642
Telephone: (312) 924-3609
Facsimile:  (312) 268-7179

**Attorneys for Plaintiffs**

*Admitted *Pro Hac Vice*

Dated:  July 14, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2021, I electronically filed the foregoing Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss the Second Amended Complaint with the Clerk of the U.S. District Court using the Court's CM/ECF system, which will send electronic notifications to all parties who have appeared and are registered as CM/ECF participants in this matter.

/s/ <u><em>Adele P. Kimmel</em></u>
Counsel for Plaintiffs
