IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. JENNY H. CONVISER and
ASCEND CONSULATION IN
HEALH CARE, LLC,

              Plaintiffs,

    v.

DEPAUL UNIVERSITY,

              Defendant.

No. 20-cv-03094
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

The breadth of Title IX is, once again, before the Court. Plaintiffs Dr. Jenny H. Conviser (Dr. Conviser) and Ascend Consultation in Health Care, LLC (Ascend) (collectively, Plaintiffs) have filed a Second Amended Complaint (SAC) against DePaul University (DePaul) asserting wrongful retaliation under Title IX, 20 U.S.C. § 1681, *et seq.* (Count I), as well as state law claims for breach of contract (Count II) and indemnification (Count III). R. 47, SAC.[1] DePaul has moved to dismiss the SAC, arguing once more—and consistent with the Court's previous ruling—that independent contractors lack statutory standing under Title IX. R. 48, Mot. Dismiss. Upon this round of briefing, however, the Court finds that Plaintiffs' interests fall within Title IX's zone of interests. The Court therefore grants in part and denies in part DePaul's motion to dismiss.

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

### I.    The Parties

Dr. Conviser is a licensed clinical psychologist engaged in the fields of sports psychology and clinical psychology. SAC ¶ 19.[2] DePaul is a large Catholic and not-for-profit university which receives federal financial assistance. *Id.* ¶ 6. From 2005 to 2018, through her companies, Dr. Conviser provided mental health care and eating disorder treatment to student-athletes, managers, trainers, coaches and other staff in DePaul's athletics program (DePaul Athletics). *Id.* ¶¶ 1, 30, 35.

Dr. Conviser owns Ascend, an Illinois limited liability company, which provides professional services for the evaluation and treatment of athletes' mental illnesses, emotional states, and related nutritional needs. SAC ¶¶ 5, 29. During all times relevant to this lawsuit, Dr. Conviser, through Ascend, employed ten to twelve therapists, as well as nutritionists and administrators, all of whom Dr. Conviser supervised. *Id.* ¶ 29.

### II.    The Professional Services Agreement

Between 2005 and 2017, Dr. Conviser's companies and DePaul entered into numerous agreements. SAC ¶ 31. When the contracts expired in accordance with their terms, DePaul and Dr. Conviser's companies routinely entered into new but nearly identical contracts. *Id.* In June 2017, DePaul and Ascend entered into a new four-year Professional Services Agreement (PSA) that allowed DePaul to refer

---

[2]The Court accepts as true all of the well-pleaded facts in the Complaint and draws all reasonable inferences in favor of Plaintiffs. *Smith v. City of Chicago*, 3 F.4th 332, 334 n.1 (7th Cir. 2021) (internal citation omitted).

student-athletes to Ascend for mental health services. SAC ¶¶ 32, 105; R. 49-1,

Professional Services Agreement (PSA).[3] The PSA reads, in relevant part:

> WHEREAS, DePaul requires the services of professionals specializing in the evaluation and treatment of mental illnesses, issues of a psychological nature, and nutritional therapy for student-athletes at DePaul;
>
> WHEREAS, DePaul desires to continue to refer certain student-athletes to obtain clinical psychological and/or counseling services on a non-exclusive basis from the professionals of Ascend;
>
> WHEREAS, AscendCHC is willing to provide clinical psychology assessment and psychotherapy and nutrition assessment, education and support for student-athletes at DePaul University who have been pre-approved by the University for such services;
>
> ***
>
> **1.  TERM**
>
> The term of the Agreement will be for four (4) years beginning July 1, 2017 ("the Effective Date"), and ending June 30, 2021 (the "Termination Date").
>
> **2.  REFERRAL**
>
> (a) DePaul may refer student-athletes that it believes are in need of clinical psychological assessment to Ascend. Ascend will provide a preliminary assessment for such student-athlete and make a recommendation as to the form of further treatment.
>
> (b) Ascend agrees to conduct a preliminary evaluation of illnesses of a psychological or nutritional nature of the student-athletes referred to it by DePaul on a non-exclusive basis.
>
> ***

---

[3]The Court takes judicial notice of the PSA because Plaintiffs discuss the contract throughout the SAC, and because the contract is central to Plaintiffs' claims. *See Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018); *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011).

## 9. INDEMNIFICATION

(a) To the fullest extent permitted by law, each Party ("the Indemnifying Party") shall defend, indemnify, and hold harmless the other party ("the Indemnified Party"), its agents, employees, affiliates, trustees, director, officers, faculty members, past or present, from and against any and all claims, damages, losses, and expenses including, but not limited to, reasonable attorneys' fees, arising out of or relating to any actual or alleged (i) misrepresentation, breach of warranty, breach of promise, or breach of covenant by the Indemnifying Party of any representation, warranty, promise, or covenant in this Agreement; and (ii) personal injury or property damage caused, in whole or in part, by the acts, errors or omissions of the Indemnifying Party, its employees, agents, representatives or subcontractors arising out of or related to the Indemnifying Party's performance of its obligations in this Agreement.

(b) The Indemnified Party agrees to notify the Indemnifying Party of the existence of any such claims or causes of action within a reasonable time after the Indemnified Party learns of such claim or cause of action. The Indemnifying Party shall not compromise or settle any claim covered by this indemnification provision without the Indemnified Party's consent.

\*\*\*

## 11.   INDEPENDENT CONTRACTOR

(a) Ascend is an independent contractor of DePaul, and neither AscendCHC nor any of its employees or contracted health service providers are employees, agents, joint venturers or partners of DePaul.

(b) AscendCHC agrees not to market or hold itself out publicly as an employee of DePaul or as the exclusive or official sports psychologist of DePaul Athletics.

\*\*\*

## 14.   TERMINATION

(a) This Agreement shall only be terminated prior to the Termination Date with prior written notice as fully set forth below or as otherwise provided in Section 14:

\*\*\*

(b) This Agreement may be terminated with prior written notice as fully set forth below:

> (i) By either party, upon the material breach of any term of this Agreement, provided thirty (30) days prior written notice is delivered to the breaching party <u>and</u> the cause giving rise to the claimed breach has not been cured within the thirty (30) day notice period.

PSA at 1, 4–5, 7 (emphasis in original).

## III. Plaintiffs' Roles at DePaul

Through her companies, Ascend and Insight, Dr. Conviser provided mental health services to DePaul student-athletes, coaches, managers, trainers, and other staff. SAC ¶ 30. These mental health services were provided through a referral process, in which DePaul would refer student-athletes to Dr. Conviser's company, the company would assess the student-athletes and recommend treatment plans, and DePaul would pay the company for its services. *Id.* ¶ 32. Dr. Conviser directly treated many DePaul student-athletes and staff and directed the treatment of patients primarily treated by Ascend's other therapists. *Id.* ¶¶ 38–40.

In addition to providing mental health services for DePaul Athletics, DePaul directed Dr. Conviser to play a role in ensuring that DePaul complied with NCAA policies and relevant federal law, including Title IX. SAC ¶ 43. In that vein, Dr. Conviser represented DePaul Athletics at the NCAA Big East Mental Health Summits, participated in DePaul's compliance reports to the NCAA, and designed on-campus advertising efforts, training, and faculty counseling to increase awareness of DePaul's available mental health services for students and staff. *Id.* ¶¶ 33–34. DePaul (and Dr. Conviser's professional licensing) also required Dr. Conviser to

participate in investigations into misconduct within DePaul Athletics of which she was aware. *Id.* ¶ 47.

DePaul provided Dr. Conviser with an on-campus office in DePaul Athletics and held out Dr. Conviser's company as "DePaul's provider" of mental health services. SAC ¶ 34. DePaul informed student-athletes that it would only pay for specialized athletic mental health care if it was provided by Dr. Conviser's company. *Id.*

## IV. Plaintiffs' Reports of Abuse and the Aftermath

When patients told Dr. Conviser or other Ascend therapists that they had experienced or witnessed abuse, Dr. Conviser worked with the patients to help them understand their rights and options for reporting. SAC ¶ 49. When appropriate, Dr. Conviser would also seek the patients' permission to report those abuses to DePaul Athletics. *Id.*

In Fall 2016, Dr. Conviser informed the Associate Athletics Director and Director for Sports Medicine, Dr. Sue Walsh (Walsh), and then-Assistant Athletics Directory Kathryn Statz (Statz) of some disturbing allegations against DePaul's acclaimed softball coach Eugene Lenti (Lenti). SAC ¶¶ 2, 50. Specifically, Dr. Conviser reported that Lenti was "out-of-control," and that he was frequently verbally and physically abusive to his staff and players. *Id.* ¶ 50. For example, Dr. Conviser reported that Lenti regularly called his players gendered epithets like "f---ing whores" and "sensitive bitches." *Id.* Rather than investigate Lenti in light of these allegations, Walsh and Statz directed Dr. Conviser to meet with Lenti and his staff to address the issues and educate them about Title IX. *Id.* ¶ 55.

In December 2017, Dr. Conviser met with DePaul's Athletics Director, Jean Lenti Ponsetto (Ponsetto), who is also Coach Lenti's sister. SAC ¶¶ 42, 61. Walsh and Dr. Jill Hollembeak (Hollembeak), who replaced Statz as Assistant Athletics Director, were also in attendance. *Id.* ¶ 61. At the meeting, Dr. Conviser, again, relayed specific instances of Lenti abusing student-athletes and coaches and stated her concern that Lenti's conduct was inconsistent with DePaul's Title IX obligations. *Id.* ¶ 62. Dr. Conviser further reported that the soccer and basketball teams were hosting recruitment events that included alcohol and sexual favors. *Id.* ¶ 64. Finally, Dr. Conviser reported that a DePaul coach was involved in a sexual relationship with a student-athlete on his team. *Id.* ¶ 65. Dr. Conviser informed Ponsetto, Walsh, and Hollembeak that the student-athlete provided sexual favors to the coach in exchange for protection from his shaming and criticism. *Id.* Dr. Conviser's reports were met with stony silence and then denial; to Dr. Conviser's knowledge, DePaul took no further action in response to Dr. Conviser's reports. *Id.* ¶¶ 66–68. Soon after the December 2017 meeting, DePaul began reducing its referrals to Plaintiffs. *Id.* ¶ 70.

In early 2018, Dr. Conviser reported the sexual assault of a student to Walsh. SAC ¶ 71. Karen Tamburro (Tamburro), DePaul's then-Title IX Coordinator, subsequently sought a meeting with Dr. Conviser. *Id.* ¶ 72. At their meeting, Dr. Conviser raised a number of issues, including the use of sex as part of DePaul Athletics' recruitment and students' discomfort reporting sexual assault and other abuses. *Id.* Tamburro mocked and criticized Dr. Conviser throughout the meeting and pressed Dr. Conviser to divulge confidential patient information. *Id.* When Dr.

Conviser refused to divulge such information, Tamburro became angry. *Id.*
Immediately after her meeting with Tamburro, Dr. Conviser received an email from
Ponsetto suggesting that Dr. Conviser was the reason student-athletes felt
uncomfortable reporting sexual abuse. *Id.* ¶ 73.

On April 6, 2018, Dr. Conviser instructed an Ascend therapist to join a call to
DePaul's Title IX Office with the source of her information to report that Lenti was
physically abusing women involved with the softball team, including that he had hit
somebody in the face. SAC ¶ 76. Around April 12, 2018, DePaul's Title IX Office, led
by Ponsetto's deputy, opened an investigation into Lenti's conduct. *Id.* ¶ 78. The next
day, Walsh, for the first time in Dr. Conviser's years with DePaul, instructed Dr.
Conviser to stop caring for a student-athlete in the middle of the student's treatment.
*Id.* ¶ 81. Around the same time, DePaul's referral rate to Ascend plummeted, with
DePaul only referring three clients to Ascend for the remainder of 2018. *Id.* ¶ 82.
DePaul also informed student-athletes and DePaul staff that it would not pay for
services provided by Plaintiffs. *Id.* ¶ 83. By 2019, DePaul stopped referring any new
patients to Plaintiffs altogether. *Id.* ¶ 84. By the beginning of 2021, Plaintiffs were
no longer treating any DePaul patients, new or returning. *Id.* ¶ 85.

DePaul never provided Plaintiffs with any explanation for the lack of referrals.
SAC ¶ 87. Nor did DePaul provide any written notice of termination of the PSA. *Id.*
¶ 89. When Dr. Conviser asked Walsh to explain why Plaintiffs were not receiving
any referrals, Walsh responded "don't kill the messenger." *Id.* ¶ 87.

8

### V.      Procedural History

On April 15, 2020, Plaintiffs filed suit against DePaul in the Circuit Court of Cook County, asserting a Title IX retaliation claim and several state law claims, including breach of contract and defamation. R. 1-1. DePaul removed the case to federal court, and Plaintiffs subsequently filed the First Amended Complaint (FAC). R. 19, FAC. On March 31, 2021, the Court granted DePaul's motion to dismiss the FAC and dismissed Counts I through III without prejudice. *Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 598 (N.D. Ill. 2021). The Court held that Plaintiffs, as independent contractors, failed to state a Title IX claim, and the Court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Id.* Plaintiffs thereafter filed the SAC. In the SAC, Plaintiffs allege, among other things, that Dr. Conviser was "excluded from participation in, and denied the benefits of," DePaul, "including the provision of mental health care to DePaul Athletics." SAC ¶ 91. DePaul's motion to dismiss the SAC is before the Court.

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

Importantly here, questions of statutory standing are also reviewed under Rule 12(b)(6), and the Court's inquiry into statutory standing at the motion to dismiss stage is limited to the pleadings. *In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 951 (N.D. Ill. 2016).

## Analysis

### I.     Title IX Retaliation (Count I)

Plaintiffs allege that DePaul retaliated against Plaintiffs in violation of Title IX by discontinuing the referral of student-athletes after Dr. Conviser reported multiple instances of abuse to DePaul. SAC ¶¶ 98–102.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX thus prohibits recipients of federal education funding from sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). While Title IX does not explicitly authorize a private cause of

action, the Supreme Court has found that Title IX contains an implied a private right of action to enforce its prohibition on intentional sex discrimination. *Id.* (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690–693 (1979)).

In *Jackson v. Birmingham Board of Education*, the Supreme Court held that the Title IX private right of action encompasses retaliation claims as well, stating: "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." 544 U.S. at 173–74 (emphasis in original).

DePaul moves to dismiss Plaintiffs' Title IX retaliation count, arguing that Plaintiffs, as independent contractors, lack statutory standing to pursue a Title IX claim. R. 49, Memo. Dismiss at 5–9. In the alternative, DePaul posits that even if Plaintiffs had statutory standing, they fail to plausibly allege the elements of a *prima facie* retaliation claim. *Id.* at 9–13. Plaintiffs respond that they have adequately alleged the elements of a Title IX retaliation claim, and that Plaintiffs can state a Title IX claim, due to, among other things, the broad language of Title IX. R. 54, Resp. at 4–23.

Before addressing the merits of these arguments, the Court must address the elephant in the room. In its previous motion to dismiss, DePaul similarly argued that Plaintiffs lack statutory standing to bring a Title IX claim. R. 24 at 4–7. The Court, in a case of first impression, agreed and dismissed Plaintiffs' Title IX claim. *Conviser*, 532 F. Supp. 3d at 598. However, the Court's dismissal was without prejudice, and

the Court granted Plaintiffs leave to file an amended complaint. *Id*.[4] Plaintiffs filed the SAC, in which they reasserted their Title IX retaliation claim, *see* SAC ¶¶ 98–102, and added allegations which were absent from the FAC.[5] DePaul, in turn, filed another motion to dismiss, in which it repeats many of its previous arguments. Mot. Dismiss; Memo. Dismiss. In some ways then, this round of briefing appears to be a mere reiteration of the last round. But, while the parties have certainly repeated some arguments, there is a new complaint, and the parties have presented new arguments about the way Title IX should be read. *See, e.g.*, Resp. at 14; R. 55, Reply at 4. Furthermore, Plaintiffs have directed the Court to cases important to the Title IX issue that were issued after the Court's last decision. *See* R. 58–63. The Court consequently takes a fresh look at the question that this case presents: whether an independent contractor has statutory standing to bring a Title IX retaliation claim.

### A. Statutory Standing

DePaul contends that Plaintiffs cannot bring a Title IX retaliation claim because Plaintiffs lack statutory standing. Memo. Dismiss at 6.

Despite its name, "statutory standing," is not really an Article III standing concept at all. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Rather, as the Supreme Court explained in *Lexmark*, statutory standing directs a court to ask whether a plaintiff "falls within the class of plaintiffs

---

[4]DePaul does not argue that it was improper for Plaintiffs to reassert their Title IX claim in the SAC. Nor does DePaul argue that it is procedurally improper for the Court to consider the Title IX issue again. *See* Memo. Dismiss.

[5]The SAC additionally does not include counts for Defamation *Per Se*, nor Defamation *Per Quod*, which were included in the FAC. *See* SAC; FAC ¶¶ 146–72.

whom Congress has authorized to sue" under the statute. *Id.* at 128. To answer that question, "[t]he zone-of-interests test is [ ] an appropriate tool . . . ." *Id.* at 130. Under that test, "[w]hether a plaintiff comes within the zone of interests is an issue that requires [a court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127 (internal quotation marks and citations omitted). Importantly, a court engaging in a zone-of-interests analysis "do[es] not ask whether in [the court's] judgment Congress *should* have authorized [the plaintiff's] suit, but whether Congress in fact did so." *Id.* at 128 (emphasis in original).

Plaintiffs argue that the Seventh Circuit's recent decision on the zone-of-interests test, *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737 (7th Cir. 2022), compels denial of the motion to dismiss. *See* R. 58, Aug. 2022 Supp. Notice. In *T.S.*, the plaintiff, an individual with autism, sued a healthcare provider for an employee benefit plan's exclusion of coverage for autism, arguing that the exclusion violated Section 1557 of the Patient Protection and Affordable Care Act (the ACA). *Id.* at 738. The defendant moved for judgment on the pleadings on the basis that the plaintiff's suit did not fall within the zone of interests protected by the statute because "only a person who is an intended beneficiary of the federal dollars it gets—that is, a recipient of [the defendant's] healthcare services—is a permissible plaintiff under section 1557." *Id.* at 738–39. The district court denied the motion but allowed the defendant to seek immediate review of the issue with the Seventh Circuit. *Id.* at 739.

13

On interlocutory appeal, the Seventh Circuit in *T.S.* examined the zone-of-interests test. The court explained that "the zone-of-interest doctrine [ ] ask[s] 'whether the statute *arguably* protects the sort of interest a would-be plaintiff seeks to advance.'" 43 F.4th at 741 (emphasis added) (quoting *Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818, 821 (7th Cir. 2019)). The Seventh Circuit further explained that the zone-of-interests analysis has two steps. *Id.* First, a court must "ascertain the purpose of a particular statutory provision, thereby identifying the interests arguably to be protected by it." *Id.* Second, a court "determine[s] whether the interests claimed by the plaintiff are among those statutory interests." *Id.* (citing *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 892–93 (7th Cir. 2019)). The Seventh Circuit emphasized that "[w]hat we do not ask is whether, in enacting the particular provision, Congress had this specific sort of plaintiff in mind." *Id.* (citing *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998)).

To ascertain the purpose of Section 1557, the Seventh Circuit turned to the statute's language: "section 1557 states that 'an individual shall not,' on various grounds including disability, 'be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.'" *T.S.*, 43 F.4th at 741 (quoting 42 U.S.C. § 18116(a)). The Seventh Circuit acknowledged that Congress did not explicitly articulate the purpose of Section 1557 but found that the provision's language "ma[de] clear the scope of interests it protects." *Id.* From the statute's language, the court found that "Section 1557 'outlaws discrimination' on enumerated

grounds 'by healthcare entities receiving federal funds.'" *Id.* The court accordingly concluded that the plaintiff's allegations brought him within the zone of interests because "section 1557 extends a cause of action to individuals who have been subjected, based on their disabilities, to discrimination by healthcare entities." *Id.* The *T.S.* court then addressed the defendant's arguments.

One such argument was that only intended beneficiaries of the federal funds the defendant receives, namely patients, are permissible plaintiffs under Section 1557. *T.S.*, 43 F.4th at 742. Since the plaintiff was not a patient, reasoned the defendant, he was not a permissible plaintiff. *Id.* The Seventh Circuit found this argument unsupported by the statutory text. As an initial matter, the Seventh Circuit observed that "section 1557 forbids discrimination against, and provides a private right of action to, 'an individual' –not a 'patient' of a health program or a 'beneficiary' of federal financial assistance." *Id.* Congress, observed the court, "'easily could have substituted' these words for 'individual' 'if it had wished to restrict the scope' of 1557." *Id.* (quoting *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982)). In *North Haven*, relied on by the Seventh Circuit, the Supreme Court similarly held that Title IX's use of the term "person," rather than "student" or "beneficiary" signaled that Congress did not intend to restrict the scope of Title IX to students or beneficiaries of federal monies. 456 U.S. at 521. The Seventh Circuit elaborated that although the defendant's patients "may be the most obvious individuals whose interests are protected by section 1557's broadly worded text, [ ] that does not mean they are the only ones covered by its language." *T.S.*, 43 F.4th at 742 (citation omitted).

15

The *T.S.* court was equally unpersuaded by the defendant's focus on Section 1557's phrase "any health program or activity." 43. F.4th at 742. While the Seventh Circuit acknowledged that Section 1557 uses the phrase "*health* program or activity," such that "health" could be said to modify the phrase "program or activity," the court nevertheless found that the phrase "plainly includes all the operations of a business principally engaged in providing healthcare[.]" *Id.* at 743 (emphasis in original). Because the defendant conceded it was an entity principally engaged in providing healthcare, the Seventh Circuit found that concession "end[ed] the inquiry." *Id.* Thus, the court held that the plaintiff had "plausibly alleged an interest that [came] within the zone of interests section 1557 seeks to protect" and affirmed the district court's ruling. *Id.* at 746.

Applying the *T.S.* framework to this case, the Court first seeks to determine the purpose of Title IX, so that the Court can "identify[] the interests arguably to be protected by" Title IX. *T.S.*, 43 F.4th at 741. Per the Seventh Circuit's instructions in *T.S.*, the Court is mindful not to ask "whether, in enacting the particular provision, Congress had this *specific sort of plaintiff* in mind." *Id.* (emphasis added).

The Court begins with the language of Title IX to ascertain its purpose. Again, it provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The statute further expressly lists nine exceptions to Title IX coverage, none of which is at issue here. *Id.* § 1681(a)(1)–(9). Similar to Section 1557

16

of the ACA, there is no specific statement of purpose in Title IX. Nevertheless, the language of Title IX, similar to that of Section 1557, indicates that the statute's purpose is to prohibit education funding recipients from discriminating against individuals on the basis of sex.

The Supreme Court confirmed this reading of Title IX's purpose in *Jackson*. There, the Supreme Court found that Title IX *"broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'"* 544 U.S. at 173 (emphasis added) (quoting 20 U.S.C. § 1681). The court further found that Title IX's use of the term "discrimination," a broad term that "covers a wide range of intentional unequal treatment," illustrated Congress' intent to "g[ive] the statute a broad reach." *Id.* at 175 (citing *N. Haven Bd. of Ed.*, 456 U.S. at 521). Thus, the Supreme Court concluded that "the text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional 'discrimination' 'on the basis of sex.'" *Id.* at 178.

In coming to its holding, the Supreme Court in *Jackson* discussed at least one other purpose for Title IX, namely, providing individual citizens effective protection against discriminatory practices. 544 U.S. at 180 (citing *Cannon*, 441 U.S. at 704). The Supreme Court found that the Title IX "objective" of effective protection against discriminatory practices would be "difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation." *Id.* (internal quotation marks and citation omitted). The court elaborated that "[r]eporting incidents of discrimination is integral to Title IX enforcement and

would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Id.*

So, from the text of Title IX and *Jackson*, two purposes of Title IX are evident: (1) to prohibit a funding recipient from subjecting any person to "discrimination," which includes retaliation, "on the basis of sex"; and (2) to provide individual citizens effective protection against discriminatory practices. 544 U.S. at 173, 180; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("Congress enacted Title IX in 1972 with two principal objectives in mind: '[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'") (citation omitted). These two purposes are stated broadly, and rightly so, as "the breadth of the zone of interests varies according to the provisions of law at issue . . . ." *Lexmark*, 572 U.S. at 130–31 (internal quotation marks and citations omitted). The Supreme Court has instructed that in order "to give Title IX the scope that its origins dictate, [courts] must accord it a sweep as broad as its language." *N. Haven*, 456 U.S. at 521 (internal quotation marks omitted) (collecting cases).

Having ascertained the purposes of Title IX from the statutory text and Supreme Court precedent, the Court turns to determining whether the interests claimed by Plaintiffs are among the statutory interests arguably to be protected by Title IX. *See T.S.*, 43 F.4th at 741.

18

Based on the Seventh Circuit's framework in *T.S.*, the Court finds that Plaintiffs' allegations bring Count I within Title IX's zone of interests. Plaintiffs allege that after reporting instances where women were being abused to DePaul—including that student-athletes were being called gendered epithets, that a student-athlete was having a sexual relationship with a coach, and that a student had been sexually assaulted—DePaul retaliated against Plaintiffs by reducing patient referrals and ultimately terminating its relationship with Plaintiffs. SAC ¶¶ 50, 65, 71. Thus, the interests claimed by Plaintiffs mirror Title IX's principal objectives: providing citizens protection against discriminatory practices, which includes effective protection against retaliation. These interests are arguably protected by Title IX and therefore fall within Title IX's zone of interests.

DePaul insists that Plaintiffs' claim falls outside of Title IX's zone of interests for two primary reasons. First, DePaul argues that Plaintiffs, as independent contractors, are not the type of plaintiffs Title IX aims to protect. Memo. Dismiss at 5, 7. Second, DePaul maintains that Title IX prohibits discrimination only in an "*education* program or activity." *Id.* at 6–7. Both arguments miss the mark in light of the Seventh Circuit's recent decision in *T.S.*

### 1.    Independent Contractors

To begin, DePaul asks the Court to focus on the fact that Plaintiffs are independent contractors (rather than students, parents, or employees). DePaul insists that Plaintiffs' interests fall outside of Title IX's zone of interests because the legislative history shows that "the statute does not protect non-student, non-parent,

19

non-employees like Plaintiffs." Memo. Dismiss at 6. In order to accept DePaul's argument, the Court would have to disregard the clear mandate from *T.S.* that a court applying a zone-of-interests analysis should not ask "whether, in enacting the particular provision, Congress had this specific sort of plaintiff in mind." 43 F.4th at 741 (citing *Nat'l Credit Union Admin.*, 522 U.S. at 492). As the Supreme Court explained in *National Credit Union Administration*, "for a plaintiff's interests to be arguably within the 'zone of interests' to be protected by a statute, there does not have to be an indication of congressional purpose to benefit the would-be plaintiff.'" 522 U.S. at 492 (internal quotation marks omitted) (collecting cases).

DePaul's independent contractor contention is also inconsistent with the Seventh Circuit's statutory interpretation in *T.S.* As discussed above, the defendant in *T.S.* argued that only patients were permissible plaintiffs under Section 1557. 43 F.4th at 742. The Seventh Circuit looked at the plain language of Section 1557, which forbids discrimination against "an individual," not a "patient" of a health program or a "beneficiary" of federal financial assistance, and rejected the defendant's argument. *Id.* According to the court in *T.S.*, Congress could have used the term "patient" or "beneficiary" if it had wanted to so limit the permissive plaintiffs. *Id.* I so finding, the Seventh Circuit relied on *North Haven*, in which the Supreme Court interpreted the term "person" in Title IX to *not exclude* employees, as "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of [Title IX]." *N. Haven Bd. of Ed.*, 456 U.S. at 521. Following the examples set forth by the Seventh Circuit in *T.S.* and the Supreme Court in *North*

*Haven*, DePaul's independent contractor argument falls short because DePaul asks the Court to read the term "person" in Title IX to mean "employee," "student," or "beneficiary," when Congress could have easily substituted those terms for "person" if it had wished to restrict the scope of Title IX.

Under DePaul's interpretation of Title IX, a university is free to retaliate against an individual who reports gender discrimination, so long as that individual is an independent contractor and not a university employee. Along those lines, DePaul claims that the Supreme Court in *Jackson* "focused exclusively on conduct targeting either employees or students, *i.e.*, those who have a protected interest in an 'education program or activity.'" Memo. Dismiss at 6 (citations omitted). But *Jackson's* focus was not on the employment status of the reporting individual, but rather on Title IX's need for individuals to be able to report incidents of discrimination without fear of retaliation: "Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied." 544 U.S. at 180–81. The Supreme Court observed that "teachers and coaches such as [the plaintiff] are often in the best position to vindicate the rights of their students *because they are better able to identify discrimination and bring it to the attention of administrators*." *Id.* at 181 (emphasis added). The Supreme Court did not say that only employees or

students should be protected from retaliation because of a protected interest in an education program or activity.[6]

Along those same lines, in *Douglass v. Garden City Community College*, 543 F. Supp. 3d 1043 (D. Kan. 2021), a case decided after the Court's previous *Conviser* opinion, the District Court found that a Title IX retaliation plaintiff need not plead that she is a university student or faculty member to have statutory standing. There, the plaintiff alleged that she had served as a host mom for university student-athletes, a volunteer for a university endowment association, and a booster for a college-sanctioned fundraising organization. *Id.* at 1054. The plaintiff further alleged that individuals shared concerns with her about the university's past and ongoing treatment of female students, including the cheer coach's inappropriate behavior towards female squad members. *Id.* at 1051. The plaintiff alleged that in retaliation for her public reporting of the alleged sexual discrimination, the defendant university, among other things, banned her from the university. *Id.* at 1052. The university defendant argued that because the plaintiff did not plead that she was a student or faculty member, she fell outside the Title IX protections for retaliation. *Id.* at 1054. The court disagreed, and citing *Jackson*, emphasized that "Title IX's enforcement scheme depends on individual reporting and accordingly protects from

---

[6]In the Court's view, it is debatable whether an educational nexus could ever provide a logical limitation to a non-student Title IX retaliation claim, as individuals who work for the school (whether technically employed or on an independent contractor basis), first and foremost, receive monetary benefits from the educational institution rather than educational benefits. For instance, it would not make sense that a custodial worker who does not participate in coursework preparation or other traditional educational work would need to demonstrate an educational nexus to bring a Title IX retaliation claim.

retaliation individuals who witness and report discrimination." *Id.* (citing 544 U.S. at 180–81). Because the plaintiff had pled that she was a school leader, and "school leaders like plaintiff 'are often in the best position to vindicate the rights of their students,'" the court denied the defendants' motion to dismiss the plaintiff's Title IX retaliation claims. *Id.* (quoting *Jackson*, 544 U.S. at 181).

DePaul repeatedly insists that a Title IX plaintiff needs to be seeking an educational benefit and emphasizes that Title IX's purpose is to provide equal access to education. *See, e.g.*, Reply at 2. Plaintiffs' claims, even as independent contractors, go to that same interest. Regardless of their technical employment status, Plaintiffs brought to DePaul's attention sexual discrimination of DePaul's student-athletes, who are pursuing equal access to education. In this way, Plaintiffs' retaliation claim involves not only Plaintiffs' right to be free of retaliation, a form of sex discrimination, but also DePaul's students' rights in pursuing their education without sex discrimination. Dr. Conviser, who acted as a mental health provider and a leader in the DePaul Athletics community, was in a position to vindicate the rights of the student-athletes she served, regardless of whether she was technically employed by DePaul. *See Douglass*, 543 F. Supp. at 1054. Therefore, under the reasoning of *Jackson*, there is no daylight between an independent contractor who reports the discrimination of a student and a university employee who does. Plaintiffs' interests, even as independent contractors, thus fall within Title IX's zone of interests.

2.      **Education Program or Activity**

DePaul's narrow interpretation of the phrase "*education* program or activity" is likewise in tension with the Seventh Circuit's decision in *T.S.* DePaul cites to nonbinding authority for the proposition that the phrase "education program or activity" limits Title IX's scope to those who seek or receive "educational benefits" from a defendant. Memo. Dismiss at 5 (citations omitted). But in *T.S.*, the Seventh Circuit read the similar phrase "*health* program or activity" to "plainly include[] all the operations of a business principally engaged in providing healthcare." 43 F.4th at 743. The Seventh Circuit first looked at the statute's definition of "program or activity," which provides that a program or activity means "'all of the operations of— among other entities—an entire corporation, partnership, or other private organization, . . . which is principally engaged in the business of providing . . . health care . . . any part of which is extended Federal financial assistance.'" *Id.* at 742 (quoting 29 U.S.C. § 794(b)). Next, the court acknowledged that the word "health" arguably modifies the phrase "program or activity," but nevertheless found that "health program or activity" clearly includes all of the operations of a business principally engaged in providing healthcare. *Id.* at 743. As such, the court in *T.S.* found that because the defendant was an entity "principally engaged in providing healthcare," all of its operations fit within the umbrella of "health program or activity" in Section 1557. *Id.* The Seventh Circuit concluded that because Section 1557's prohibition on discrimination was not, "by its own terms, limited to the discrete portion of a covered entity that receives federal financial assistance, the right to sue

24

under section 1557 is not limited to plaintiffs who are intended to benefit from that assistance." *Id.* at 744. Thus, the plaintiff's claim that "he was the victim of intentional disability discrimination in one part of [the defendant's] operations" put his claim "within the zone of interests protected by section 1577." *Id.*

Applying the same textual analysis in this case, it is clear that Title IX, by its own terms, is not limited to plaintiffs who are intended to benefit from discrete portions of an educational institution that receives federal financial assistance. The Civil Rights Restoration Act of 1987 (CRRA) expansively defines "program or activity" for purposes of Title IX as "all of the operations of . . . a college, university, or other postsecondary institution." 20 U.S.C. § 1687(2)(A). Using the reasoning employed in *T.S.* here, then, "all the operations of" DePaul, a college, constitute an "education program or activity" under Title IX. Because Plaintiffs allege that they suffered retaliation, a form of sex discrimination, by DePaul Athletics, a part of DePaul's operations, their claims fall within the zone of interests protected by Title IX.

Admittedly, as Plaintiffs acknowledge, *see* Resp. at 17 n.11, this reading of Title IX—in the context of an educational institution defendant, at least—appears to render the term "education" in the phrase "education program or activity" superfluous. However, contrary to Defendants' argument in reply, *see* Reply at 2 n.1, "the presence of some redundancy is rarely fatal on its own to a statutory reading." *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 862 (7th Cir. 2022) (internal quotation marks and citations omitted). Indeed, "[s]ometimes the better overall reading of the statute contains some redundancy." *Rimini Street, Inc. v. Oracle USA, Inc.*, --- U.S. -

---, 139 S. Ct. 873, 881 (2019). Here, it appears that the better overall reading of the Title IX is that the term "education" in the phrase "education program or activity" is superfluous with respect to educational institution defendants due to the history of the statutory scheme.

In 1972, when Title IX was enacted, it did not provide a definition for "program or activity receiving Federal financial assistance." In that absence, the Supreme Court interpreted the phrase "program or activity receiving Federal financial assistance" to narrow the reach of Title IX, such that a Title IX plaintiff had to have been discriminated against by the discrete program or activity receiving federal funds, rather than by the institution as a whole. *T.S.*, 43 F.4th at 745 (citing *Grove City College v. Bell*, 465 U.S. 555, 573–75 (1984); *N. Haven Bd. of Ed.*, 456 U.S. at 535–40).

Congress directly repudiated the Supreme Court's reading of the phrase by passing the CRRA. "Finding that the Supreme Court's decisions had 'unduly narrowed or cast doubt upon . . . the broad, institution-wide application of antidiscrimination-in-federal-funding statutes like the Rehabilitation Act, Congress responded with the Civil Rights Restoration Act of 1987." *T.S.*, 43 F.4th at 745 (citing Pub. L. No. 100-259, § 2(1), 102 Stat. 28, 28 (1988)). The CRRA added the previously discussed, all-encompassing definition of "program or activity," to Title IX, the Rehabilitation Act, and other federal statutes cited in Section 1557 of the ACA. *Id.* at 746; *see also Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 (1999). The accompanying Senate Report stated that the CRRA phrase "all of the operations of"

encompasses, but is not limited to "traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities." S. REP. NO. 100-64 at 17 (1988).

Because the CRRA modified not only Title IX, but several other civil rights statutes as well, it makes sense that certain terms are repeated. If the CRRA had only modified Title IX, there would be no need for specific subsections regarding educational institutions and corporations principally engaged in the business of providing education, *see* 20 U.S.C. § 1687(2)(A), (2)(B), (3)(A). But because the CRRA was a provision amending multiple different civil rights statutes at once, and because it was enacted to broadly clarify that "discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance," S. REP. NO. 100-64 at 4 (1988), the CRRA targets multiple different institutions receiving Federal financial assistance, such as those involved in housing, health care, social services, and parks and recreation. In light of this amendment history, the stronger reading of Title IX appears to be that the term education in the phrase "education program or activity" in 20 U.S.C. § 1681(a) became redundant for cases involving educational institution defendants after the passage of the CRRA.

In short, with the CRRA, "Congress [] made clear its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs." *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994). If the Court were to accept DePaul's interpretation of Title IX—that the phrase "education program or activity" limits Title IX's scope to those who seek or receive

27

"educational benefits" from the defendant—the Court would "defeat [the CRRA's] purpose by recognizing artificial distinctions in the structure or operation of an institution." *Id.* Title IX cannot prohibit discrimination in the "faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities" if Title IX only protects plaintiffs who seek to receive educational benefits from a university defendant. *See Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1125–26 (D. Kan. 2017) (rejecting defendant's argument that Title IX plaintiff must show nexus to educational activity in light of "Congressional intent that Title IX reach 'traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities'"); *Hauff v. State Univ. of New York*, 425 F. Supp. 3d 116, 132 (E.D.N.Y. 2019) (same). DePaul's reading of Title IX is thus at odds with the text and purpose of the CRRA.

Moreover, even if the word "education" meaningfully modified "program or activity" with respect to educational institutions like DePaul, a recent Court of Appeals decision shows that Plaintiffs were "subjected to discrimination under an[] *education* program or activity." In *Snyder-Hill v. Ohio State University*, contract referees (and other students, former students, and non-students) brought Title IX actions, alleging that university officials knew of, facilitated, and actively concealed sexual abuse of students by an athletic team doctor. 48 F.4th 686, 691–92 (6th Cir. 2022).[7] The defendant university argued that the non-student plaintiffs could not

---

[7] Plaintiffs filed a notice of supplemental authority regarding *Snyder-Hill*, R. 61, and DePaul filed a response, R. 63. The Court has considered both in its discussion of *Snyder-Hill*.

bring a Title IX claim. *Id.* at 707. The Sixth Circuit rejected that argument, explaining that "[c]ontrary to [the defendant's] assertions, we have never limited the availability of Title IX claims to employees or students." *Id.* (citations omitted). In a case of first impression, the court held that "a non-student and non-employee can bring a Title IX claim if they were subject to discrimination 'while participating, or at least attempting to participate, in the funding recipient's education program or activity.'" *Id.* at 708 (quoting *Doe v. Brown University*, 896 F.3d 127, 131 (1st Cir. 2018)). The Sixth Circuit further held that "education program or activity" is "defined broadly and extends to situations in which individuals are, for example, accessing university libraries or other resources, or attending campus tours, sporting events, or other activities." *Id.* The court in *Snyder-Hill* found that the independent contractor referees stated Title IX claims because they were participating or attempting to participate in the college's athletic program by participating in sporting events. *Id.*

In this case, Plaintiffs allege that they were subject to retaliation, a form of discrimination, while working with DePaul Athletics, through a referral system, to treat DePaul's student-athletes. Plaintiffs allege that as part of their treatment of student-athletes, Plaintiffs accessed DePaul's resources, such as Dr. Conviser's on-campus office in DePaul Athletics and DePaul's conference rooms for staff meetings and trainings. SAC ¶ 36. The SAC additionally states that DePaul tasked Plaintiffs with helping DePaul Athletics achieve goals set by the NCAA concerning mental health services for the student-athletes, Dr. Conviser represented DePaul Athletics at mental health summits, Dr. Conviser served on DePaul's Equity, Welfare, and

Sportsmanship subcommittee alongside other senior DePaul staff and administrators, Dr. Conviser participated in DePaul's compliance reports to the NCAA, and Dr. Conviser was required by DePaul to participate in investigations into misconduct within DePaul Athletics. *Id.* ¶¶ 33, 44, 45, 47.[8] In all of these ways, Plaintiffs participated or attempted to participate in DePaul Athletics, and courts have consistently treated athletics as educational for purposes of Title IX. *See, e.g.*, *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 915–22 (7th Cir. 2012); *Jackson*, 544 U.S. at 171–72.

Put simply, Plaintiffs allege that they are "person[s]" who have been "subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The plain language of the statute does not require a plaintiff to have been denied an educational benefit, nor does the statute limit its application to students, employees, or beneficiaries of the federal financial assistance. The Court finds, on second look and with the advantage of the *T.S.* and *Snyder-Hill* decisions, that Plaintiffs' interests fall comfortably within the zone of interests Title IX arguably serves to protect.

### B.    Plaintiffs' Title IX Claim

In the alternative, DePaul posits that even if Plaintiffs have statutory standing, their retaliation claim still fails because they have not plausibly alleged the elements of a *prima facie* retaliation case. Memo. Dismiss at 9.

---

[8] Some of these detailed allegations regarding Plaintiffs' participation in DePaul Athletics, including Dr. Conviser's participation in DePaul's Equity, Welfare, and Sportsmanship subcommittee, were not included in the FAC. *See* FAC.

A recipient of federal funds retaliates against a person in violation of Title IX when (1) the person "engage[s] in a statutorily protected activity"; (2) the school "t[akes] a materially adverse action against" the person; and (3) "there exist[s] a but-for causal connection between the two." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citations omitted). In assessing Title IX retaliation claims, courts look to case law concerning analogous suits brought under Title VII. *See id.* at 695–96.

DePaul takes issue with two aspects of Plaintiffs' Title IX retaliation allegations.[9] First, DePaul contends that Plaintiffs cannot state a retaliation claim based on Dr. Conviser directing a colleague to join a call on which a source reported Lenti's alleged misconduct in 2018. Memo. Dismiss at 9–11. Second, DePaul maintains that Plaintiffs fail to allege an adequate causal connection between Dr. Conviser's early complaints and DePaul's decision to stop referring new patients to Ascend. *Id.* at 12–13. The Court addresses each argument in turn.

### 1.     Third-Party Retaliation

DePaul spills much ink characterizing one of Plaintiffs' allegations of engaging in a protected activity as a "third-party retaliation" claim. That is, DePaul argues

---

[9]In a footnote, DePaul insists that Ascend, as a corporate entity, "cannot participate in protected activity." Memo. Dismiss at 11 n.8 (citing *Crawford v. George & Lynch, Inc.*, 2012 WL 2674546, at *3 (D. Del. July 5, 2012)). This undeveloped, footnote argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"); *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016); *see also* J. Valderrama Standing Order, Memorandum of Law Requirements ("Generally, the Court will not consider substantive arguments contained in footnotes.").

that Dr. Conviser's connection to an alleged report about Lenti in April 2018 is too tenuous to support a retaliation claim. Memo. Dismiss at 9 (citing *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174–75 (2011)). DePaul reasons that because Dr. Conviser alleges only that she directed a colleague to join a call on which a third party engaged in protected activity by reporting suspected Title IX misconduct against another party, Dr. Conviser's retaliation claim is a "third-party retaliation" claim that falls short because Dr. Conviser does not plead a sufficiently close connection between Dr. Conviser and the "source" who reported the violation on the April 2018 call. *Id.* at 10.

In *Thompson*, the Supreme Court read Title VII's antiretaliation provision as broad enough to encompass an employee who was fired in retaliation for a discrimination charge filed by a fiancé, declining to impose a "categorical rule that third-party reprisals do not violate Title VII." 562 U.S. at 172–75. The court likewise declined to "identify a fixed class of relationships for which third-party reprisals are unlawful." *Id.* at 175. The court explained that it "expect[ed] that firing a close family member will almost always [suffice], and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to generalize." *Id.*

The fundamental problem with DePaul's third-party retaliation argument is that the SAC makes clear that Plaintiffs are not bringing a third-party retaliation claim this time around. In the FAC, Plaintiffs merely asserted that "[u]pon hearing of this incident, Dr. Conviser instructed her staff to counsel the patient to

32

immediately report the incident to DePaul's Title IX Office . . . [and] made it clear to her staff that if the patient did not report it, Dr. Conviser . . . would have to report it. The patient subsequently reported the incident to the Title IX office which opened an alleged investigation." FAC ¶ 109. The SAC, by contrast, states: "On April 6, 2018, in accordance with detailed instructions by Dr. Conviser, an Ascend therapist joined the source of her information to call the Title IX Office and report that Lenti was physically abusing women involved with the softball team—including, specifically, that he had had hit one in the face." SAC ¶ 76.

Plaintiffs are thus alleging in the SAC that they, themselves, engaged in a protected activity by prompting and participating in a call to report Title IX violations to DePaul's Title IX office. *See, e.g., Weeks v. Kansas*, 503 F. App'x 640, 642 (10th Cir. 2012) (noting a worker engages in protected activity when she "actively assist[s] other employees in asserting [Title VII] rights") (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)); *Condiff v. Hart Cty. Sch. Dist.*, 770 F. Supp. 2d 876, 883 (W.D. Ky. 2011) (holding that, because "Plaintiff was involved in the opposition of the sexual harassment including the decision to contact school officials[,] . . . she engaged in protected activity"); *see also O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (noting that protected activity involves "some step in opposition to a form of discrimination that the statute prohibits"). They are not alleging that only the "source" engaged in a protected activity, and that Plaintiffs were retaliated against for the "source's" protected activity. DePaul's third-party retaliation claim, on that basis alone, falls apart.

33

What's more, DePaul attempts to knock out Plaintiffs' entire retaliation claim by focusing on just one allegation concerning Plaintiffs' reporting of gender-related discrimination. Even if Plaintiffs did not adequately allege that they engaged in a protected activity based on the April 2018 phone call—and DePaul has not persuaded the Court that that is the case—the SAC contains numerous other allegations of Plaintiffs reporting allegations of abuse. The SAC alleges that Dr. Conviser repeatedly reported abuses against women students to DePaul officials. *See, e.g.*, SAC ¶¶ 49, 50, 64, 65. Plaintiffs allege that Dr. Conviser reported, for example, that: Lenti regularly called his female players gendered epithets like "f---ing whores" and "sensitive bitches," *id*. ¶ 50; a DePaul coach was involved in a sexual relationship with a student-athlete on his team, *id*. ¶ 65; men's athletics teams were hosting recruitment events that promised sexual favors from female DePaul students, *id*. ¶ 64; and a student had been sexually assaulted, *id*. ¶ 71. These allegations provide another example of how this version of the complaint differs from the last; the FAC did not include allegations regarding Dr. Conviser's reporting of the inappropriate sexual relationship with a coach, nor her reporting of men's athletic teams using sexual favors from female DePaul students as a recruitment strategy. *See* FAC. As a result, the SAC's allegations about Plaintiffs' engagement in a protected activity are sufficient to survive DePaul's motion to dismiss.

### 2. Causal Connection

DePaul next attacks Plaintiffs' Title IX claims for lacking a sufficient causal connection between Plaintiffs' reports of abuse and DePaul's decision to stop referring

patients. Memo. Dismiss at 12. Specifically, DePaul argues that "years elapsed between Conviser's 2016 report and the alleged 2018 retaliation—far too long to support a retaliation claim, particularly given the undisputed fact that DePaul renewed the PSA in 2017." *Id.*

At the pleadings stage, a Title IX retaliation plaintiff need not plead evidence, but rather must only "plausibly allege a causal connection between protected activity and the retaliation." *Vazquez v. Suncast Corp.*, 2019 WL 2576554, at *3 (N.D. Ill. June 24, 2019) (citing *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014)); *see also Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 385 & n.3 (7th Cir. 2016) (finding that a complaint stating plaintiffs engaged in protected activity and employee retaliated as a result was adequate at the pleading stage); *Smith v. EMB, Inc.*, 576 Fed. App'x 618, 620 (7th Cir. 2014) (stating that for a "retaliation claim, [plaintiff] needed to allege only that she was subject to an adverse employment action after she engaged in a specifically identified protected activity") (emphasis removed). That said, "a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible. If the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." *Carlson*, 758 F.3d at 828 (citation omitted).

Here, the Court agrees with Plaintiffs that the SAC alleges that DePaul took various materially adverse actions because of Plaintiffs' protected activity. SAC

¶¶ 70, 72–73, 81–85. Plaintiffs additionally allege a series of events from which an inference of but-for causation may be drawn, the most meaningful of which is the allegation of temporal proximity between Plaintiffs' protected activities and DePaul's adverse actions. The SAC states that DePaul began to reduce referrals after the December 2017 meeting and then, more dramatically, after the April 2018 report, which DePaul allegedly knew Plaintiffs had directed. SAC ¶¶ 70; 77, 80–82. Sue Walsh, the official who had been Plaintiffs' primary referral source at DePaul, according to the SAC, never again referred a patient to Ascend after the April 2018 report, *id*. ¶ 83, and there were only seven days between the April 2018 report and DePaul's directive to Dr. Conviser to stop care for a patient mid-treatment, *id*. ¶ 81. This sequence of events is more than enough to raise an inference of retaliation. *See, e.g., Carlson*, 758 F.3d at 829 (holding plaintiff plausibly pleaded causal relationship between protected activity and adverse action "a few months later"); *Vazquez*, 2019 WL 2576554, at *3 (holding "the one-month interval between [plaintiff's] protected activity and [the adverse action] . . . states a plausible retaliation claim"). "The fact that full execution of the adverse action took a while longer . . . is immaterial" when the initial temporal proximity was so close. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 773 (7th Cir. 2008). Plaintiffs have accordingly pled enough for the causation element of their retaliation claim. DePaul's causation arguments, based on cases decided at summary judgment, do not persuade the Court otherwise. It may be the case, after an evidentiary record is established, that DePaul has the better of the argument, but on a motion to dismiss, this argument fails to carry the day. Because

the Court finds that Plaintiffs have adequately alleged Title IX retaliation, DePaul's motion to dismiss Count I is denied.

## II.     Breach of Contract (Count II)

Plaintiffs allege that DePaul breached the PSA by terminating the agreement before the termination date. SAC ¶ 110. In addition, Plaintiffs allege that DePaul breached the implied covenant of good faith and fair dealing by refusing to send new referrals to Dr. Conviser, and by telling student-athletes that DePaul would no longer pay for Plaintiffs' services. *Id.* ¶ 111. DePaul moves to dismiss Plaintiffs' breach of contract claim, arguing first that it did not terminate the PSA prematurely or otherwise breach the express terms of the contract, and second that the implied covenant of good faith and fair dealing cannot be used to impose new, affirmative obligations. Memo. Dismiss at 13–14.

### A.     Breach of Express Promise in the PSA

To plead breach of contract under Illinois law, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (internal quotation marks and citation omitted). Courts "construe contracts by giving their unambiguous terms clear and ordinary meaning[.]" *Id.* (citations omitted). In reviewing contracts, courts review the agreement as a whole, rather than examining any one provision in isolation. *Id.*

Plaintiffs allege that the PSA provides only three instances in which termination could occur before the termination date, June 30, 2021: (1) imminent

37

threats by Ascend to student-athletes; (2) the felony conviction of an Ascend counselor; or (3) Ascend losing its business license or corporate charter. SAC ¶ 89. Since none of the three bases for early termination occurred, assert Plaintiffs, DePaul breached the PSA when it stopped referring patients to Plaintiffs before the termination date and announcing to students that it would not pay for Ascend's services. *Id.* ¶¶ 89, 110. DePaul retorts that it did not prematurely terminate or otherwise breach the contract because the PSA provides that DePaul "may" refer student-athletes to Ascend for treatment, but does not *require* DePaul to refer students. Memo. Dismiss at 13.

The plain language of the PSA supports DePaul's position. The PSA states that DePaul "*may* refer student-athletes . . . to Ascend." PSA ¶ 2(a) (emphasis added). The PSA also provides that Ascend would evaluate "student-athletes referred to it by DePaul on a non-exclusive basis." *Id.* ¶ 2(b). The PSA even specifies that Ascend would not "market or hold itself out publicly . . . as the exclusive or official sports psychologist of DePaul Athletics." *Id.* ¶ 11(b). The PSA thus makes clear that the parties did not have an exclusive relationship, and that DePaul could, but was not required to, refer patients to Plaintiffs. *See Sigler v. GEICO Cas. Co.*, 967 F.3d 658, 661 (7th Cir. 2020) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive . . . .") (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112 (2012)) (emphasis in original); *see also Burger v. Spark Energy Gas, LLC*, 507 F. Supp. 3d 982, 990 (N.D. Ill. 2020) (collecting cases finding that the use of "may" in a contract gives a party

discretion but does not mandate the party to do something). DePaul did not breach the contract then by decreasing and then eventually stopping its referrals. *See Royal Consumer Prods. LLC v. Walgreen Co.*, 2019 WL 1595889, at *2–4 (N.D. Ill. April 15, 2019) (dismissing breach of contract claim absent a contractual obligation to buy goods from the plaintiff). Nor did that discontinuation of referrals equate to a termination of the agreement, for the agreement did not require DePaul to refer any patients.

### B.    Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs likewise contend that DePaul breached Illinois' implied covenant of good faith and fair dealing by reducing and then ending patient referrals. Resp. at 24–25. "A duty of good faith and fair dealing is implied into every Illinois contract." *Barwin v. Vill. of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) (internal citation omitted); *Martindell v. Lake Shore Nat. Bank*, 154 N.E.2d 683, 690 (Ill. 1958). While the implied covenant of good faith and fair dealing does not create an independent cause of action, violation of the duty may give rise to a breach of contract claim. *Burger v. Spark Energy Gas, LLC*, 507 F. Supp. 3d 982, 990 (N.D. Ill. 2020).

Illinois courts and courts interpreting Illinois law have interpreted the implied covenant of good faith and fair dealing in two different ways. Unsurprisingly, the parties' frame their arguments under different frameworks and thus, like two ships passing in the night, the parties' arguments sail past each other.

On one hand, as DePaul argues and the Seventh Circuit has recently stated, the covenant "is essentially used as a construction aid in determining the intent of

the parties where an instrument is susceptible of two conflicting constructions." *Bernacchi v. First Chicago Ins. Co.*, 52 F.4th 324, 330 (7th Cir. 2022) (quoting *Fox v. Heimann*, 872 N.E.2d 126, 134 (Ill. App. Ct. 2007)); *Barwin*, 54 F.4th at 454; *see also LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 937 (N.D. Ill. 2007) ("[T]he covenant is "invoked to determine the intent of the parties where a contract is ambiguous and subject to more than one construction.") (collecting cases). "[T]he covenant cannot be used to add terms in order to reach a result more equitable to one of the parties." *Bernacchi*, 52 F.4th at 330 (internal quotation marks and citation omitted).

On the other hand, in the other line of cases, which are relied on by Plaintiffs, courts interpret the doctrine not as a construction aid, but rather as a requirement that, "[w]here a contract specifically vests one of the parties with broad discretion in performing a term of the contract, . . . the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Eckhardt v. Idea Factory, LLC*, 193 N.E.3d 182, 194 (Ill. App. Ct. 2021) (internal quotation marks and citations omitted); *see also LaSalle Bank Nat'l Assoc v. Paramont Properties*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008) (internal citations omitted); *McCleary v. Wells Fargo Sec., L.L.C.*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015).

Both methods of interpretation make clear, however, that under Illinois law "parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract."

*Paramont Properties*, 588 F. Supp. 2d at 857 (quoting *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395–96 (7th Cir. 2003)). The two interpretations of the doctrine do not necessarily conflict, and indeed, in applying the doctrine, some courts ask whether the contract is ambiguous *and* whether it imparts discretion on the parties. *See, e.g.*, *Cromeens, Holloman, Sibert*, 349 F.3d at 395 ("There is no ambiguity and the provision does not vest a single party with discretion but rather grants both parties the unfettered right to terminate."); *N. Tr. Co. v. VIII S. Michigan Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995). That said, not every contract that imparts discretion on a party is ambiguous.

The Court, however, not need resolve the conflict because Plaintiffs' claim fails under either interpretation of the doctrine. Under the "construction aid" method, the Court finds that, although the SAC alleges bad faith, the implied covenant of good faith and fair dealing does not come into play because the language of the PSA is unambiguous: DePaul "*may* refer patients" to Plaintiffs. *See Moran Foods, Inc.*, 477 F. Supp. 2d at 937. Plaintiffs cannot invoke the covenant of good faith and fair dealing to override the plain language of the PSA. *See Cromeens*, 349 F.3d at 395–96. Put differently, the implied covenant of good faith and fair dealing cannot be used to rewrite the PSA so as to require DePaul to refer patients when the express language of the contract did not.

For similar reasons, the Court also finds Plaintiffs' claim fails under the "discretion" method relied on by Plaintiffs. Plaintiffs argue that the PSA provided DePaul with discretion to perform an obligation—whether to refer patients—and that

41

when DePaul reduced and then ended patient referrals, it acted in a manner inconsistent with Plaintiffs' reasonable expectations developed over the course of their thirteen-year relationship. Resp. at 25. Unlike their arguments in support of their Title IX retaliation claim, Plaintiffs invested little effort in developing their implied covenant argument. Indeed, Plaintiffs' entire argument in support of this claim is premised on their contention that they state a claim based on the breach of an express obligation (that is, DePaul's obligation to refer student-athletes to Plaintiffs), and Plaintiffs cite no authority holding that an implied covenant claim can survive without an underlying contractual obligation. *See* Resp. at 24–25. True, the use of the term "may" in a contract can signal that a party has discretion and therefore support a claim for breach of contract under the implied covenant of good faith and fair dealing. *See Burger*, 507 F. Supp. 3d at 990. But even under the one case cited by Plaintiffs, the doctrine is invoked only where a party exercises discretion in bad faith "*in performing an obligation under the contract.*" *Paramont Properties*, 588 F. Supp. 2d at 857 (emphasis added); *see also McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013) (the doctrine does not "permit a party to enforce an obligation not present in the contract"). As discussed above, *see supra* Section II.A, the PSA did not impose an obligation on DePaul to refer patients to Plaintiffs. So, because there was no underlying contractual obligation to refer any patients, the SAC fails to state a plausible claim for breach of the contractual duty of good faith and fair dealing. Accordingly, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails.

42

Because Plaintiffs have failed to state a breach of contract claim, either by an express breach or a breach of the implied covenant of good faith and fair dealing, the Court grants DePaul's motion to dismiss Count II of the SAC. Because amendment would be futile, the dismissal is with prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015) (court may dismiss complaint with prejudice "[w]here it is clear that the defect cannot be corrected so that amendment is futile").

## III.   Indemnification (Count III)

The SAC alleges that, pursuant to Section 9 of the PSA, DePaul has agreed to indemnify Plaintiffs for Plaintiffs' reasonable costs and fees, including attorneys' fees, related to seeking redress for their damages caused by DePaul's breaches of the PSA. SAC ¶¶ 119–29. DePaul moves to dismiss Plaintiffs' indemnification claim, arguing that the indemnification provision does not provide for first-party indemnification. Memo. Dismiss at 14–15.

Under Illinois law, parties can agree to indemnify claims brought by non-parties to the contract (third-party claims), as well as claims brought by one party against another party to the contract (first-party claims). *See Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*, 936 N.E.2d 1127, 1133–34 (Ill. App. Ct. 2010). "[A] party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves." *Id.* (internal quotation marks and citations omitted). Even so, an

agreement "may *implicitly* limit indemnification to third parties . . . if it contains language inconsistent with first-party indemnification." *NAR Bus. Park, LLC v. Ozark Auto. Distributors, LLC*, 430 F. Supp. 3d 443, 461 (N.D. Ill. 2019) (emphasis in original).

For instance, a blanket indemnification clause with a duty to defend requirement would generally indicate that the indemnification clause pertained to third-party claims only, "as it makes little sense to defend a claim against one's self." *NAR Bus. Park*, 430 F. Supp. 3d at 461 (citing *Open Kitchens, Inc. v. Gullo Intern. Development Corp.*, 466 N.E.2d 1313, 1315 (Ill. App. Ct. 1984)). Similarly, language in indemnification clauses requiring notice or approval of settlement has been found to be inconsistent with first-party indemnification. *See John Hancock Life Insurance Company v. Abbott Laboratories, Inc.*, 183 F. Supp. 3d 277, 326 (D. Mass. 2016) (applying Illinois law, holding participation in defense and approval of settlement inconsistent with first-party indemnification), *reversed in part on other grounds*, 863 F.3d 23; *Matter of Quantum Chemical Lummus Crest*, 1993 WL 135449, *3 (N.D. Ill. Apr. 29, 1993) (indemnification procedures requiring notice and duty to defend would be rendered "nonsensical" by extension to first-party claims).

Here, the indemnification clause of the PSA is very broad and does not expressly limit its scope to third-party claims. It provides that:

> To the fullest extent permitted by law, each Party ("the Indemnifying Party") shall defend, indemnify, and hold harmless the other party ("the Indemnified Party"), its agents, employees, affiliates, trustees, director, officers, faculty members, past or present, from and against any and all claims, damages, losses, and expenses including, but not limited to, reasonable attorneys' fees; arising out of or relating to any actual or alleged (i) misrepresentation, breach

of warranty, breach of promise, or breach of covenant by the Indemnifying Party of any representation, warranty, promise, or covenant in this Agreement; and (ii) personal injury or property damage caused, in whole or in part, by the acts, errors or omissions of the Indemnifying Party, its employees, agents, representatives or subcontractors arising out of or related to the Indemnifying Party's performance of its obligations in this Agreement.

PSA ¶ 9(a). At first glance, then, this indemnification clause could apply to first-party claims.

However, a closer look at the PSA reveals that the indemnification clause was intended for third-party claims only. For starters, the broad indemnification language above includes a duty to defend, which has been found to be inconsistent with first-party indemnification. *See NAR Bus. Park*, 430 F. Supp. 3d at 461. After all, why would DePaul defend a claim brought by Plaintiffs against DePaul? *Id.* The indemnification clause, furthermore, goes on to require that the indemnified party provide notice of the existence of claims to the indemnifying party, and that "[t]he indemnifying party shall not compromise or settle any claim covered by this indemnification provision without the indemnified party's consent." *Id.* ¶ 9(b). These notice and settlement requirements only make sense in the context of third-party indemnification because DePaul would not need extra notice about a lawsuit lodged against it, and DePaul would never need to provide Plaintiffs permission to settle a lawsuit against DePaul. The Court consequently finds that the language of the PSA is inconsistent with first-party indemnification, and the indemnification clause does not apply to Plaintiffs' first-party claims against DePaul. Therefore, DePaul's motion to dismiss Count III is granted. The dismissal is with prejudice, as amending the SAC on this count would be futile. *See Runnion*, 786 F.3d at 520.

## Conclusion

The Court grants in part and denies in part DePaul's motion to dismiss the SAC [48]. The motion is granted with respect to Counts II and III, and the Court dismisses those counts with prejudice. The motion is denied with respect to Count I. The Court refers discovery supervision (including setting all deadlines, resolution of any discovery motion, and resolution of any motion to stay discovery) and settlement matters to Magistrate Judge Gilbert.

Dated: January 9, 2023

United States District Judge
Franklin U. Valderrama

46